VINEYARD LAND & STOCK CO. v. TWIN FALLS SALMON RIVER LAND
& WATER CO. et al.

(Circuit Court of Appeals, Ninth Circuit. August 6, 1917.)

No. 2885.

**1. WATERS AND WATER COURSES ☞247(1)—PRIOR APPROPRIATIONS—EVIDENCE—WEIGHT.**

That surveys and estimates of plaintiffs claiming under the Carey Act (Act Aug. 18, 1894, c. 301, § 4, 28 Stat. 422 [Comp. St. 1916, § 4685]) were made three years earlier than those of defendant renders plaintiffs' testimony as to the amount of water appropriated the more reliable, because speaking of a time much nearer the time of plaintiffs' appropriation.

**2. WATERS AND WATER COURSES ☞247(1)—PRIOR APPROPRIATION—EVIDENCE—SUFFICIENCY.**

In a suit between appropriators of water from an interstate stream, under the Carey Act, evidence *held* to support the court's estimate that 5,500 acres comprised all the lands which defendant had under irrigation at the time of plaintiffs' appropriation.

**3. WATERS AND WATER COURSES ☞240—APPROPRIATION—MODE.**

An appropriation of water from a public stream, under the Carey Act, may be initiated by notice or by actual diversion from the stream, either process being evidentiary of the intent on the part of the person giving the notice to make an appropriation.

**4. WATERS AND WATER COURSES ☞240—APPROPRIATION—EXTENT.**

In the appropriation of water from a public stream by notice, the notice would indicate the amount of the intended appropriation, while in appropriation by diversion the capacity of the ditch used for the purpose would indicate the appropriator's thought as to the amount designed for use.

**5. WATERS AND WATER COURSES ☞249—APPROPRIATION—BENEFICIAL USE—DILIGENCE.**

After initiating an appropriation, an appropriator must use due diligence in applying the water for a beneficial use or he will be deemed to have abandoned his rights as to appropriations by others in the meantime.

**6. WATERS AND WATER COURSES ☞249—APPROPRIATION—BENEFICIAL USE—"DILIGENCE."**

Whether an appropriator of water from a public stream has used due diligence to utilize the water for a beneficial use must be determined upon the facts in the particular case, "diligence," as employed in such case, being largely a relative term.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Diligence.]

**7. WATERS AND WATER COURSES ☞249—APPROPRIATION—DILIGENCE—EVIDENCE—SUFFICIENCY.**

The want of diligence of defendant and his predecessor in constructing the high-line ditch, and the application of the water through it to a beneficial use, *held*, under the evidence, to deprive defendant of its initiatory rights in so far as affecting plaintiffs' appropriations.

**8. WATERS AND WATER COURSES ☞249—APPROPRIATION—AMOUNT NECESSARY.**

An appropriator can claim no more water than is necessary for the purpose of the appropriation, and when he has that he cannot prevent others from using the surplus.

**9. WATERS AND WATER COURSES ☞254—APPROPRIATION—AMOUNT NECESSARY—EVIDENCE—SUFFICIENCY.**

In suit between appropriators of a public stream, *held*, under the evidence, that the court properly concluded that 12,500 acre-feet was sufficient to answer the needs of defendant under its appropriations.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

10. WATERS AND WATER COURSES ⊚⟿254—APPROPRIATION—BENEFICIAL USE—AMOUNT.

In a suit to determine conflicting rights to the waters of a public stream, 3 acre-feet per acre for hay and grain land, and 1½ acre-feet for pasture land, *held* a reasonable allowance to defendant, whose land was only slightly above the water in the streams.

11. WATERS AND WATER COURSES ⊚⟿247(1)—RIGHTS AS BETWEEN STATES—PARTIES.

The rights, as between states, to share in the waters of an interstate stream, is a matter for adjustment between the states, and individual users cannot raise a question about the use of such water in another state out of the territorial jurisdiction of the court.

12. WATERS AND WATER COURSES ⊚⟿247(1)—PRIOR APPROPRIATIONS—NATURE OF SUIT.

A suit to determine rights to the waters of a public stream between parties claiming by prior appropriation is essentially one to quiet title to real property and is local and not transitory.

13. COURTS ⊚⟿29—POWERS—PROPERTY OUTSIDE OF JURISDICTION.

The rem may not be affected by the direct operation of the decree where it is beyond the territorial jurisdiction of the court, but the court may, acting in personam, coerce action respecting such property.

14. WATERS AND WATER COURSES ⊚⟿240—USE—RESTRICTIONS.

Ordinarily one having obtained the right to use a given quantity of water from a public stream may change the place or character of its use and the point of diversion.

15. WATERS AND WATER COURSES ⊚⟿247(1)—REGULATION OF USE—TERRITORY BEYOND JURISDICTION OF COURT.

The United States District Court of Idaho had the power, in a proceeding in personam, to restrict defendant's use of the water to a circumscribed locality in Nevada, where a change in territory would result in less water flowing back into the stream, resulting in loss to plaintiffs.

16. WATERS AND WATER COURSES ⊚⟿247(1)—REGULATION OF USE—TERRITORY BEYOND JURISDICTION OF COURT.

It was also proper to impose upon defendant the obligation of installing measuring devices and keep a record of the amount of water diverted, etc., and provide that plaintiffs should have the right of inspection.

17. WATERS AND WATER COURSES ⊚⟿240—CAREY ACT—PERFECTING APPROPRIATION—TIME.

In a project, under the Carey Act of Congress, to impound all waters of the Salmon river, in Idaho, plaintiffs had 10 years within which to make diversion, and proof thereof, for a beneficial use, in view of Laws Idaho 1915, c. 94.

Appeal from the District Court of the United States for the Southern Division of the District of Idaho; Frank S. Dietrich, Judge.

Suit by the Twin Falls Salmon River Land & Water Company, a corporation, and another, against the Vineyard Land & Stock Company, a corporation. From the decree entered, defendant appeals. Affirmed.

Frank K. Nebeker, of Salt Lake City, Utah, C. A. Boyd, of Ogden, Utah, Edwin Snow, of Boise, Idaho, and C. B. Henderson, of Elko, Nev. (Howat, Marshall, Macmillan & Nebeker, of Salt Lake City, Utah, of counsel), for appellant.

Richards & Haga and J. L. Eberle, all of Boise, Idaho, for appellees.

Before GILBERT and HUNT, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge. This suit was instituted to determine the conflicting water rights alleged by the parties, respectively, to have been acquired by prior appropriation. The defendant, appellant here, is engaged in raising and husbanding stock upon the ranges, consisting in most part, but not entirely, of lands it has acquired and now owns. It is alleged that these appropriations of water are from Salmon river and its tributaries. The river extends for many miles in the state of Nevada, running in a general northerly direction, crosses the northern boundary line into the state of Idaho, and continues in that state down to where its waters are captured by plaintiffs, who are the appellees here. The plaintiffs are the owners of a project devised and constructed under the provisions of the Carey Act of Congress (Act Aug. 18, 1894, c. 301, § 4, 28 Stat. 422 [Comp. St. 1916, § 4685]), whereby is impounded all the water coming down Salmon river, by means of a dam of unusual dimensions, forming a reservoir in the stream. The dam being completed, water was first turned into it about May 1, 1911, and its use for irrigation began in June of that year. The appropriation was acquired under three permits issued by the state engineer of the state of Idaho. These permits are: (1) No. 2,659, for 1,500 cubic feet per second, with a priority as of December 29, 1906; (2) No. 3,267, for 500 cubic feet, with a priority as of August 22, 1907; and (3) No. 5,519, for 1,000 cubic feet, as of September 7, 1909. It was intended by the project to reclaim 150,000 acres of land, but, because of the limited water supply, the system was reduced to reclaim approximately 100,000 acres only. Water rights have been actually sold aggregating about 73,000 acres. The entire water flow, however, never reached the dimensions of the first permit, and, generally, but a small proportion thereof. That these appropriations were regularly made and acquired there is no dispute; the sole controversy being as to what appropriations the defendant has that are prior in time and superior in right to the plaintiffs' appropriations. The principal ranches for which appropriations are claimed by the defendant are the Hubbard ranch, lying mainly in township 43, range 63 east, a small portion only extending into township 44; the Vineyard ranch, in township 44, range 63; the San Jacinto ranch, extending from the center line of section 21, township 45, range 64, to about the south line of section 23, in township 47, range 64, being comprised by townships 45, 46, and 47, range 64 east; and the Bridge ranch, on the Shoshone creek, a tributary to Salmon river, in township 47, ranges 64 and 65. Other small appropriations are claimed from other tributaries to Salmon river, which will be mentioned specifically.

The trial court decreed that defendant is entitled to 12,500 acre-feet of water to satisfy the rights which may be said to be prior to those of the plaintiffs. This comprises all appropriations upon all the ranches designated, as well as those to be specifically mentioned. The decree specifically describes the lands to which the appropriations are appurtenant, and defendant's counsel claim that these aggregate approximately 11,660 acres, which a cursory estimate from the record confirms, but say there are in fact something over 3,000 acres of unirrigated lands described in the decree. The trial court, however, in

its opinion, indicated that a prior right should be recognized in the defendant for the irrigation of 3,000 acres of hay land and 2,500 acres of pasture, aggregating 5,500 acres. Its basis for the duty of water was approximately 3 acre-feet for hay and grain land and 1½ acre-feet for pasture.

The testimony on the part of the defendant relating to the diversions of water upon the lands claimed to have been irrigated, the dates diversions were made, the amount diverted, the specific lands to which the use was applied, and the seasonal application, is quite voluminous, and, as it covers many years, depending very largely upon the memory of witnesses, it is wanting in that specific and exact detail that one would wish to make it altogether dependable and reliable. Such a state of the record requires, therefore, the application of the greatest care and diligence in resolving the ultimate facts upon which to pass the decree.

The defendant's stock ranges, located along Salmon river and its tributaries in both Idaho and Nevada, are at an elevation ranging from 5,200 feet to 5,700 feet above sea level. The growing season for crops of grains and grasses is consequently short as compared with lower levels. That such crops may be satisfactorily and profitably produced cannot be questioned; but as to grains and alfalfa, it may be conceded that they cannot be produced in such great abundance as on the lower levels. For instance, but two crops of alfalfa can be produced during the season, while the usual croppings in the lower levels are three. The testimony in the record shows that, during the whole time these ranges have been occupied down to the time that this controversy arose, there were but about 21 acres of wheat and 27 acres of oats grown on the entire ranges. This is evidentiary in a way of the adaptability, or want of adaptability rather, of such lands for profitably producing such crops. The inference is that such crops were not economically profitable for the stock industry, or the lands were not profitably adaptable for growing the same, taking into consideration, along with the quality of the soil, the short seasons and the convenience or inconvenience of marketing owing to the distance from marketing centers. These lands up to this time have not been generally occupied for residential or home purposes, and but few cabins have been maintained upon the ranches, and those only for the habitation of range riders or caretakers of stock, while the stock was being provided with feed in the late fall or winter season.

In a general sense, the manner of irrigating the lands was by the flooding system; that is, depending in a measure on the flood waters that came down along about the month of June in such quantities as to overflow the banks of the streams, but more generally upon the construction of dams and barriers in the streams, by rude and unscientific methods, to throw the water out in such quantity as to cover the lands, and allow it to remain thereon a considerable length of time. The waters thus thrown out upon the land are controlled more or less by the construction of ditches and conduits for carrying them upon lands that they would not ordinarily reach in the usual course when thrown out of the natural channel. The ditches, most of them, until

later years, were of primitive construction, and in many instances were so laid as to make use of the sloughs and swales for conducting water to places of advantage. Latterly some of the ditches were built with greater attention to scientific construction, the most conspicuous of which is the Harrell ditch, which will be especially treated of later. Generally the water was used for producing the natural grasses indigenous to those localities, including the rye grass, a very nutritious article of food for stock. In considerable measure the native grasses were produced in such quantities as to be cut for hay, and were so cut and fed to stock as occasion demanded; but by far the larger proportion of the area thus irrigated was utilized for pasturage only. This pasture land generally lies contiguous to the streams and the natural runways for the water. Much of it is grown over with willows in greater or less density, and other parts are occupied by sloughs and swales, where to some extent a coarse grass grows upon which the stock browse. In the more recent years water has been thrown over considerable areas of land covered with sagebrush, for the purpose, it is claimed, of promoting the growth of the natural grasses found there for pasturage purposes. This is upon the higher levels, and at best the grass found there is insignificant in quantity. By reason of the water table being near the surface, and the natural percolation that takes place in the soil, and considering also the overflooding, this method of irrigation results in the lower levels in returning very large quantities of water to the natural streams.

Having made these general observations, which apply practically without question, we will proceed to a consideration of the testimony.

We can best get at the most satisfactory results by a comparison of maps which have been introduced in evidence as exhibits, considering along with them the testimony giving statistics as the result of witnesses' observations.

The witness L. W. Beason made measurements and surveys of defendant's property in 1914, and was engaged in the work, he and his subordinates, about eight months. This, it must be observed, was some seven or eight years after plaintiffs made their first appropriation. After relating what ditches he found, giving their measurements and capacities, the witness produced a map, defendant's Exhibit No. 11, covering the Hubbard and Vineyard ranches, which shows by the coloring the hay and pasture lands; the total acreage being, hay land 866.7 acres, and pasturage 1,728.3 acres. He also produced defendant's Exhibit 12, a map which covers the Salmon river or San Jacinto ranch, extending from Bird's Nest to Boar's Nest, with different colorings indicating the different kinds of lands, such as first-class pasture lands, second-class pasture lands, etc. He gives the area of each class, all claimed to be under irrigation, as follows:

First-class pasture land..................................... 2,501.2 acres.
Second-class pasture land................................... 1,073.7  "
Hay land................................................... 1,766.2  "
Grain land................................................. 1,481.7  "
Seeded to timothy..........................................  242.6  "

Total .................................................. 7,065.4  "

This, with the lands of the Hubbard and Vineyard ranches added, makes a grand total of 9,660.4 acres.

The witness relates that there are none of the lands marked meadowlands, or first or second class pasture lands, that have not received the benefits of irrigation. Other plowlands were measured, not shown on the exhibit, of which there are 1,205.4 acres, all under the Big ditch. This latter must be excluded, as will appear from a consideration of the Harrell or High Line ditch. Witness also produced a map, defendant's Exhibit No. 13, covering the Bridge ranch. This shows:

Pasture land................................................... 428.0 acres.
Hay land...................................................... 124.8 "
Grain land.................................................... 27.3 "

Total ...................................................... 580.1 "

Making a grand total, comprising all these ranches, of 10,240.5 acres.

On the other hand, the plaintiffs produced one E. B. Darlington, also a civil engineer, who made observations and estimates in 1911, three years earlier than those made by Beason, and yet four or five years later than the date of plaintiffs' first appropriation. He produced maps covering the Vineyard ranch and all above that, including the Bridge ranch. These are plaintiffs' Exhibits 11 and 18. The former shows by different colorings the different lands under irrigation in that year, and the latter designates by various colors additional lands that defendant claims are under and subject to irrigation. On the Vineyard ranch the maps show:

Hay land, irrigated............................................ 429.6 acres.
Pasture land, irrigated........................................ 18.3 "
Pasture land, not irrigated.................................... 83.8 "

Total, irrigated land...................................... 447.9 "
   "    not irrigated...................................... 83.8 "

As to the San Jacinto ranch, not including the Bridge ranch, these maps show:

Hay land, irrigated............................................ 1,033.4 acres.
Pasture land, irrigated........................................ 788.6 "
Alfalfa land, irrigated........................................ 140.2 "
Wheat ........................................................ 21.0 "

Total ...................................................... 1,983.2 "

On the Bridge ranch:

Hay land, irrigated............................................ 150.7 acres.
Pasture, irrigated............................................. 57.6 "
Pasture, irrigable............................................. 157.2 "

Total ...................................................... 365.5 "

—and a small acreage of wheat.

Aside from these, there is a tract shown of 414.0 acres, designated as hay not irrigated, and another tract of 1,117.4 acres, designated as pasture not irrigated.

To recapitulate, this shows:

Hay and pasture land, irrigated............................ 2,639.4 acres.
Hay and pasture land, not irrigated........................ 241.0 "
The two tracts last mentioned.............................. 1,531.4 "

Making a grand total of.................................... 4,411.8 "

This witness has not included in his maps nor in his testimony the Hubbard ranch. In making a résumé of the irrigated lands, he says:

"The total area watered from Salmon river was 2,265 acres; from Shoshone creek (Bridge ranch), 160 acres; from Jake's creek, 143 acres."

For comparison, we should add to this estimate the Hubbard lands, comprising, as shown by defendant's Exhibit 11, by a calculation of the subdivisions alleged to be irrigated, 920 acres, making a total of 5,331.8 acres. If this amount be deducted from defendant's estimate of 10,240.5, it shows a discrepancy between the figures of the parties of 4,908.7 acres.

E. C. McClellan, testifying in rebuttal for defendant, shows that the total acreage under irrigation in the year 1889 from Bird's Nest to Boar's Nest was 4,178.4 acres, and on the Vineyard ranch 814.4 acres, aggregating 4,992.8 acres, and that the total irrigation in 1904 amounted to 5,981.2 acres. These statements are discredited by certain maps which the witness himself prepared, namely, defendant's Exhibit 4, purporting to show the area under irrigation on the Vineyard ranch, and plaintiffs' Exhibit 32, exhibiting the lands under irrigation extending from Bird's Nest to Boar's Nest. The coloring on these maps shows an irrigation in solido of all lands within the delineations. The representation as to the latter district is disproved by Beason's map, defendant's Exhibit 12, and as to the former is plainly disputed by other testimony in the case.

Pursuing the inquiry further, relating to lands under irrigation elsewhere, according to Beason's testimony, defendant's Exhibit 7 covers lands on Trout creek, which are, as estimated, 50 acres of hay and 170 acres of pasture; defendant's Exhibit 14, being of the Nall ranch, shows hay 53.4 acres, and pasture 104.3 acres; defendant's Exhibit 15, Shoshone Basin ranch, 127.0 acres of hay, and pasture 914.7 acres— a total of 1,419.4 acres. This enlarges the discrepancy to 6,328.1 acres, for the plaintiffs' testimony takes no note of these lands.

Resting the deduction here for the present, particular reference will be made to the testimony of Darlington given in rebuttal, he having produced a composite map, plaintiffs' Exhibit 33, on which irrigated lands are designated in red and lands not irrigated in green. Speaking from the map, he says:

"On that part of plaintiffs' Exhibit 33 showing the Vineyard ranch, colored in green, the land was very largely in sagebrush, rye grass and partly incrusted with alkali. We could find no evidences of irrigation. We searched for it. A strip on the east side of Jake's creek and running down the west boundary of the tract was covered with sagebrush. It is the tract lying between the field colored red and the Tunnel ditch. It is the land shown on defendant's Exhibit No. 4 as being irrigated. * * * Where it is hatched in red has since been cleared."

Referring to a photograph taken near the crossing of the Tunnel ditch and Jake's creek, the witness continues:

"The sagebrush land in the foreground of this picture shows the land that was excluded. That land didn't bear any evidences of having been irrigated. I didn't find any ditches on it. I walked over it, just observing general conditions. I didn't make any special search for ditches at that time. I made observations with the view of finding any sources of irrigation and the land that was being irrigated. The land at the north and east of the field in red on plaintiffs' Exhibit 33 down the river and which is colored in green on that exhibit, was grown up to willows and is not irrigated so far as I could find. There are no evidences of any irrigation or ditch lines. The land from the northerly limit of what is colored green on plaintiffs' Exhibit 33, as part of the Vineyard ranch, and the little strip of green which appears at the southern line of section 20, 45 north, is a narrow canyon overgrown with willows in the bottom. There are no ditches along there. The land in sections 20 and 21, 45 north, and 17 and 16, 46 north, colored in green on plaintiffs' Exhibit 33, is overgrown with willows and cut up with sloughs. There was no evidence of artificial irrigation. There is evidence of overflow by the river during high water season. The land in township 45 north, at the east of the strip colored red on plaintiffs' Exhibit 33, and colored green on that exhibit, claimed by the defendant to be irrigated, is overgrown with willows and cut up with sloughs. I could discover no evidences of any ditches there. A large part of it would overflow during high water of the river. There are sloughs through it, which in 1911 were overgrown with willows and sagebrush. I could see no signs of any systematic use of them for irrigation. By systematic I mean artificial use, where water had been directed and controlled. I think those lands have not been cut over; they are covered with sagebrush and willows. The land in section 34, between the two fields colored red on plaintiffs' Exhibit 33, colored in green on that exhibit, is overgrown with willows and other brush, and cut up by sloughs. The land in sections 22, 23, and 14, township 46 north, colored in green on plaintiffs' Exhibit 33, is very largely in willows, rabbit brush, and some sagebrush. I couldn't find any that had been irrigated. The island south of the lane is largely sand bars and gravel bars. The lane is represented by the white strip not colored, extending through section 14. South of that was sand and gravel bars and sagebrush. The island north of the lane, colored in red, is cut up by sloughs and willows; not so much sagebrush north of the lane. On the entire ranch from Bird's Nest to Boar's Nest, I would say there are between 500 and 1,000 acres covered with willows. In some places they widen out into wide strips and in other places there is just a fringe along the bank. The river bank throughout this entire ranch from Bird's Nest to Boar's Nest is low relative to the surrounding country. The river overflows and floods a large part of it at certain times of the year. It would overflow a considerable part of it without dams in the river. The land I have colored green and hatched in red represents land that has not been either cleared or in cultivation since the extension of the High Line ditch beyond the lane. The explanation I have made as to the condition of the land that is colored green and not included as irrigable land, extends to other parts of the map and to which my attention has not been particularly called."

.C. B. Stocking, another witness adduced for the plaintiffs, testifies referring to plaintiffs' Exhibit 33:

"Taking the land north of the lane between the border of the red line and the east line of the river, there is a strip of land north of the lane, and partly south of the lane, of 1,117.4 acres; it extends north about a mile. I have included that as pasturage not irrigated. It evidently is inundated in high water, but the main part of it is covered with sagebrush and willows. The willows are very thick in places and very wide in places; at the upper end they cover practically the entire strip from the east channel of the river over to the boundary of the irrigated land. North of that I have an area of 414 acres, classified as hay, not irrigated, on the island. There

were willows lining the banks of the stream and scattering willows across the island. There were no ditches at that time. I looked the island over quite carefully and found no indications that there had been any ditches. The river in high water evidently overflowed. The land that is east of the east fork of the river, which would now lie under the Big ditch as constructed, was at that time entirely covered with sagebrush. It was not under any ditch that was then carrying water, and the acreage was computed as lands that could be brought under the ditch. Going south of the San Jacinto lane, up as far as Middle Stacks, is an area which was included in this 1,117.4 acres as pasturage not irrigated. The land that is south of the San Jacinto lane, included between the branches of the river, is land that is covered with sagebrush, gravel bars and willows. Over towards the west fork of the river there are large gravel bars and in sections down in the bottom the sagebrush is very thick, making walking difficult. On the land south of the lane and east of the west branch of the river, marked or corrugated on plaintiffs' Exhibit 33, is sagebrush and rabbit brush. There was no grass that I could find in the sagebrush, with the exception of right along the river bank. There was a strip probably 300 feet wide of rye grass that was quite tall in places; it grew in bunches. From the looks of it, it had not been cut that year, because it interfered with the sights of our transits. Between the Upper Middle Stack and what is known as the Big ditch, I have marked a strip designated as brush, containing 57 acres. I could find nothing in it but brush; no grass whatever; practically bare. In the strip that is green going from the Lower Middle Stack to the Upper Middle Stack, and the strip in green composed of the river and willows, I could see nothing that had been irrigated; nothing but brush, no rye grass to speak of. That is the condition all the way up through the Upper Middle Stack. I traversed the west side of the river, and the southern part is included in pasture designated as being irrigated, but which is more than 50 per cent. covered with sagebrush. It is very rough and some rye grass grows down towards the river banks. On the east side of the river there was nothing that I could find but sagebrush, and no more grass than would ordinarily grow in the sagebrush. From the head of the Bird's Nest ditch, going over to the east branch of the river, there is a mass of willows that is almost impenetrable. We had to keep watch of the boys going through to see that they did not get lost. That is the condition to Contact and above. At the place marked green here the river is in a narrow, rocky bottom, with willows on the bottom and I think a little grass between the clumps, such as you would ordinarily see down on the river bottom. At the upper end of the Vineyard ranch, going up towards the mouth of what we call the old Vineyard ditch, is a strip of green of 42.3 acres, marked as pasture not irrigated. That lies down below the bluffs right next to the river and is fringed with willow clumps scattered through it, used as pasture, and in my judgment would be overflowed when the river got to a little lower than its highest mark. There are no ditches there. The section lying north of the Vineyard and between the boundaries of the Tunnel ditch, was grown up to sagebrush and rye grass. On the east side of this border of grass is sagebrush and rabbit brush and rye grass scattered through. From the appearance of it it had not been cut. It was in bunches and where you find bunches you will find rye grass up probably two or three feet high. The north end of the Vineyard is what is known as Starvation field. There was no grass to be found. It was willows, sagebrush and bare ground. It is alkalied. Down below Starvation field, as far as it is colored, is simply willows. Sagebrush comes down to the willows. The willows bordered the river for a distance on each side, and there was no grass."

[1] Now, it must be admitted that there is a wide difference between these estimates on the part of plaintiffs and defendant; but if the real facts were known as of the time of plaintiffs' appropriation, it is believed that the difference would be, in great measure, reconciled. Plaintiffs' surveys and estimates were made three years earlier than those of the defendant, and the space of time intervening would, if

the facts were absolutely known, in all probability account for much of it. It at least renders plaintiffs' testimony the more reliable, because the plaintiffs are speaking of a time much nearer the time of plaintiffs' appropriations. Furthermore, the testimony above specially alluded to goes very strongly to the discredit of defendant's estimates, so that one cannot say that they are in a reasonable measure reliable. We are impelled, therefore, considering also the entire testimony, to give the greater credit to the plaintiffs' estimates. In final conclusion on this phase of the case, taking the plaintiffs' estimates, there are included the two tracts of 414 and 1,117.4 acres respectively. Stocking says the former tract consists of wild hay irrigated; that "this is low-lying land along the river. The river flows on both sides of it, and it is covered with willows and wild grass. I never found any irrigating ditches on it." The latter tract, which he mentions as containing 1,117.4 acres, he says is wild land; that "this is grown up with sagebrush and wild rye grass and willows and has never been irrigated." If the aggregate of these tracts be deducted from the total of 5,361.8 acres, there would remain 3,830.4 acres. Or if the latter tract only be deducted, there would remain 4,244.4 acres. In one aspect or the other, these figures represent lands irrigated from the Bridge ranch to the Hubbard ranch, inclusive. This gives credit for the entire amount that defendant's maps show was irrigated on the Hubbard ranch, namely, 920 acres. Deducting these figures from the trial court's estimate of 5,500 acres, there is left in the one case 1,669.6 acres, and in the other 1,255.6 acres. This latter figure is in all probability quite sufficient to cover all irrigated lands comprised by the outside ranches.

[2] We concur with the trial court's estimate of 5,500 acres, as comprising all the lands which were under irrigation at the time of plaintiffs' appropriations.

The foregoing conclusion, it will readily be seen, is in anticipation of the inquiry as to the extent to which the appropriation of water by means of the Harrell or Big ditch is prior to the plaintiffs' appropriation. In reality, the two subjects are distinct one from the other, and require separate discussion and treatment.

The first construction of the Harrell ditch was to take the water out of Salmon river in the northeast quarter of section 9, township 45 north, range 64 east, and run it into Roland East Side slough, which was but a short distance. The next was to capture the water from Roland slough, in the southeast quarter of the northwest quarter of section 34, in township 64. "It extended along the east side of the bottom," says McClellan, "and up to 1904 had been carried about three miles in length, to a point opposite the San Jacinto lane, and for another quarter of a mile was partly constructed." The present location of the ditch was made in 1892, after which McClellan relates he ran a line for the Harrell ditch throughout its entire length. This was done in September, 1897, and construction commenced immediately afterwards. That, he relates further, is the ditch which was constructed entirely down to the San Jacinto lane, and perhaps a little below, in 1904. On cross-examination of McClellan, it appears that the Harrell

ditch was constructed from the river to the Roland East Side slough in the fall of 1893. The next spring the slough was enlarged for a distance of perhaps a mile. Moore did some work on the ditch in 1894. In 1897 the ditch was started from the Roland slough. It was laid out 77 chains in length, and nearly, if not all, constructed that fall. That work carried it to a point "a good three miles and a half above the San Jacinto lane." The next September (1898) the extension of the ditch was laid out to a point opposite the San Jacinto lane, 330 chains in all. The terminus of the Harrell ditch in 1909 was the same as in 1904. The witness laid out some work in 1909. He surveyed from a point a quarter of a mile north of the San Jacinto lane to the point of crossing Trout creek, since which time he has had nothing to do with the ditch.

Darlington first saw the Harrell ditch in 1910. It then had been built to a point about 300 yards below the road in section 13. There was a strip of sagebrush land all along the canal until it got up near the head, and then wild hay meadows along the river. In 1911 most of the land on the San Jacinto ranch between the river and the Harrell ditch was still in sagebrush. At that time some land had been irrigated from the Roland slough, and a little strip from the Harrell ditch. During the year 1911 the Harrell ditch was built to a point probably a mile and a half further north, and somewhat east into section 7, and since that time has been extended almost to Shoshone creek. About 5,000 acres were brought in under the new construction.

Hugh McGuire relates that he did some work on the Harrell ditch in 1901, namely, extending the ditch from the lane to the old work, and that the first extension after that was in 1904, when it was constructed across the land about a quarter of a mile. That part was not used for irrigation while he was there, and it was in that condition to the end of 1906, when he left.

Adam Patterson testifies that he took charge of the defendant's properties November 1, 1908, and that they built the Harrell ditch from San Jacinto lane to a point north of where the ditch makes a big bend. This extension was made in the latter part of May or the first of June, 1909. McClellan had laid out the line. The big bend that the witness alludes to, probably, is in section 1, township 47, range 65.

Thomas R. Beason testifies that he went upon the defendant's property in 1910. At that time the Big or Harrell ditch was not completed; the upper end of it was used for irrigating land above the lane. There was work done on the Big ditch in 1910, 1911, and 1912, and it was completed to the present terminus in 1912. In 1911 they cleared 500 or 600 acres, and put a couple of hundred acres in grain in 1912. In 1913 the total cleared and broken was 1,700 acres, and in 1914 about that area was sowed to oats, and they broke up 1,200 acres additional. On November 28, 1892, the Sparks-Harrell Company filed notice of location and claim of water to be diverted from Salmon river sufficient to irrigate some 4,000 acres, which relates to the intended appropriation by the Harrell ditch, and on June 12, 1899, filed an amended notice claiming an appropriation of 200 cubic feet of water, and specifying more particularly the lands to be irrigated. The construction

and diversion subsequently made are claimed to have been in pursuance of those notices.

To recapitulate: The notices for the appropriation of water from Salmon river by construction of the Harrell ditch were filed, the first in 1892, and the second in 1899. In 1897 McClellan ran the survey for the ditch throughout its entire length. The first construction was to build a ditch from the river to the Roland slough. The next construction was to capture the water from the slough some distance below by means of the ditch, which was extended 77 chains in the fall of 1897. The next extension was to the San Jacinto lane. This was in the main completed in 1904. It was related that the terminus of the ditch was the same in 1909 as in 1904, and further that there was a strip of sagebrush land all along the canal, extending up to near its head. This was the case still in 1911. There was an extension in 1909 to the big bend, and in 1910, 1911, and 1912 the ditch was extended to its present terminus. In 1911, 1912, 1913, and 1914, large areas under the ditch were reduced to cultivation, and presumably water was applied thereto from the ditch.

The inquiry is, to what extent was there an appropriation of water prior to the plaintiffs' appropriations, the first of which was made in 1906?

There can be no doubt that, if all this extension of the High Line canal had been made and the water applied to the lands under the canal prior to plaintiffs' appropriations, defendant would have had the better right. The defendant and its predecessor, however, have been dilatory in maturing their appropriation, and, if they have not acquired a superior right, it is because of their lack of diligence in applying the water to the soil. Five years elapsed before the construction of the ditch for any considerable distance, after the project was entered upon by filing the notice of location and making survey of the line, and 7 years additional elapsed before its extension to the San Jacinto lane. No further extension was made until five years later, when the ditch was partially constructed to the big bend, and it was not finally completed until two years beyond that time. No considerable effort was made to apply the water to irrigation purposes on the sagebrush land lying under the ditch until 1911, which was about 19 years after the project was entered upon.

[3, 4] An appropriation of water from a public stream may be initiated by notice, now required to be given by law in some, if not all, of the arid states, or by actual diversion from the stream. Either process is evidentiary of the intent on the part of the person giving the notice to make an appropriation. In the former case, the notice would indicate the amount of the intended appropriation; in the latter, the capacity of the ditch or conduit by which the diversion is actually made would be indicative of the appropriator's thought as to the amount of water designed for use. These methods are only initiatory of the appropriation. Other steps must be taken before the appropriator's purpose can ripen into a completed appropriation. These first steps, however, will enable the appropriator to claim his right as

against subsequent appropriations until his scheme has been completed. It has been said that:

"The diversion of the water ripens into a valid appropriation only where it is utilized by the appropriator for a beneficial use." Hewitt v. Story, 64 Fed. 510, 12 C. C. A. 250, 30 L. R. A. 265; Walsh v. Wallace, 26 Nev. 299, 67 Pac. 914, 99 Am. St. Rep. 692; Nevada Ditch Co. v. Bennett, 30 Or. 59, 45 Pac. 472, 60 Am. St. Rep. 777.

See, also, Wiel on Water Rights in the Western States (3d Ed.) § 478.

[5] It is a principle of law, recognized by authorities, that an appropriator must exercise reasonable diligence, after he has initiated an appropriation, in applying the water to a beneficial use. If he fails in this, he will be held to have abandoned or forfeited his right, as it may affect appropriations acquired in the meantime. He cannot play the dog-in-the-manger act, and expect for all time to deprive other intended users of the benefits to be derived from appropriations regularly and legally instituted or made. The Ophir Silver Mining Co. v. Carpenter, 4 Nev. 534, 97 Am. Dec. 550.

[6] "Diligence," as here employed, is largely a relative term, and its proper application is to be determined by the facts in each particular case as they are made to appear. What would be accounted diligence under a particular state of facts might not be so accounted under different circumstances. Thus a person making an appropriation for the irrigation of a small tract of open land ready for the plow would be expected to apply the water to the beneficial use intended in a much shorter time than one making a diversion for application upon a large tract, where it was necessary to clear the land of brush and shrubbery found thereon before it could be made adaptable to cultivation. And, again, the means that the intending appropriator has at hand, whether meager or ready, has an important bearing upon the situation, and will be taken into account as to whether proper diligence has been employed.

[7] In the light of these observations, we may determine whether the defendant company and its predecessor, the Sparks-Harrell Company, had employed proper diligence in reducing their intended appropriation to a beneficial use prior to the time when the plaintiffs made their appropriations. From the time notice had been given by Sparks-Harrell Company of its intention of making its appropriation, namely, November 28, 1892, to the time of plaintiffs' appropriation, more than 14 years had elapsed, and yet the Big ditch had not been constructed from a point a quarter of a mile north of the San Jacinto lane. Some progress had been made before that time from the head of the ditch at its junction with the Roland East Side slough, but the ditch had been constructed only to the San Jacinto lane in 1904, which was 12 years after the notice was given, and 7 years after McClellan made his survey of the proposed High Line ditch. In the meantime, from 1904 up to the date of plaintiffs' appropriation, no attempt had been made to reduce the sagebrush land under the ditch to cultivation, although the water had been thrown out upon it for the purpose of producing in greater abundance the native grasses found among the sagebrush. The grasses there found were scanty and sparse; nor did irrigation serve largely to promote their growth. The employment

of water for this purpose can scarcely, in this day of agricultural progress in the arid states, be classed as a beneficial use. Further, it does not appear but that the defendant's predecessors had means at their command for constructing this ditch and applying the water to the lands under the ditch in a very much shorter time. Indeed, when the present company once entered upon the work in earnest, it appears that it not only constructed the High Line ditch to its terminus, but reduced the greater part of the lands under it to cultivation in the space of 4 years, from 1911 to 1914.

We conclude, therefore, that because of the want of diligence on the part of the defendant and its predecessor in constructing the High Line ditch and the application of the water through it to a beneficial use, defendant has lost whatever initiatory rights it may have acquired to an appropriation, in so far as it affects the plaintiffs' appropriations, and must be relegated to their superior and paramount rights.

[8] We come now to the subject of the duty of water. The law in Nevada respecting the same seems to be fairly well settled:

"No person can, by virtue of a prior appropriation, claim or hold any more water than is necessary for the purpose of the appropriation. * * * It must be exercised with reference to the general condition of the country and the necessities of the people, and not so as to deprive a whole neighborhood or community of its use, and vest an absolute monopoly in a single individual." Barnes v. Sabron, 10 Nev. 217, 243, 244.

An appropriation does not extend in a legal sense to any water except such as is used beneficially. Dick v. Caldwell, 14 Nev. 167.

An appropriator is entitled only to the amount of water he needs, economically and reasonably used, and when he has that he cannot prevent others from using the surplus. Roeder v. Stein, 23 Nev. 92, 42 Pac. 867, 868.

"The law is that an appropriator is only entitled to so much water, economically used, within his appropriation, as is necessary to irrigate his land. The necessary amount of water varies with the seasons." Gotelli et al. v. Cardelli et al., 26 Nev. 382, 69 Pac. 8.

"Cutting wild grass produced by the overflow of the river, or, as expressed by the witnesses, by the water of Reese river coming down and spreading over the land, was not an appropriation of that water, within the meaning of that term. Neither was the grazing of the land an appropriation of the water, under the facts." Walsh v. Wallace, supra.

See, also, Union Mill & Mining Co. v. Dangberg (C. C.) 81 Fed. 73.

The statutes of the state on water rights and irrigation promulgate a like policy, and are in harmony with these views.

Other states have adopted the same principle. The Supreme Court of Idaho has this to say on the subject:

"In determining the duty of water, reference should always be had to lands that have been prepared and reduced to a reasonably good condition for irrigation. Economy must be required and demanded in the use and application of water. Water users should not be allowed an excessive quantity of water to compensate for and counterbalance their neglect or indolence in the preparation of their lands for the successful and economical application of the water. One farmer, although he has a superior water right, should not be allowed to waste enough water in the irrigation of his land to supply both him and his neighbor, simply because his land is not adequately prepared for the economical application of the water." Farmers' Co-operative Ditch Co. v. Riverside Irrigation Dist., 16 Idaho, 525, 102 Pac. 481.

Of like effect is Hough v. Porter, 51 Or. 318, 95 Pac. 732, 98 Pac. 1083.

[9] The trial court, by a careful analysis, having in mind, no doubt, the Herrington report, which was not introduced in evidence but referred to by counsel and stipulated that it might be considered, has concluded that 12,500 acre-feet was sufficient to answer the needs of the defendant under its appropriations, which seems to us to be a fair and equitable estimate. It is unnecessary to follow the reasoning here. Some observations pertinent to the inquiry may be indulged in, however.

[10] The court has allowed practically 3 acre-feet for 3,000 acres, and 1½ acre-feet for 2,500 acres. Practically all the land to which the appropriations were applicable is low and nearly level, and lies at only a slight altitude above the water as it flows in the streams, and by reason of percolation from the streams and the sloughs which traverse the territory in some sections, and the nearness of the water table to the surface of the soil, must receive considerable subirrigation, the amount of which, of course, is not readily ascertainable. Such land, as reason suggests, does not require the same amount of surface irrigation as land lying at a higher level, or table-land, where its only source of irrigation is from the surface. It is argued that the measurements of water taken in 1914, which form the basis of the Herrington report, do not include the Hubbard, Nall creek, Upper Trout creek, Big creek, and the Shoshone Basin territory. True, that is the case. But in that year defendant was absolutely free to use all the water it cared to, and probably used it upon all the lands that it now claims were subject to irrigation in that year, on the Vineyard, San Jacinto, and Bridge ranches, which comprised a larger area than that which we now find, from a consideration of all the diversions upon all the ranches, the defendant is entitled to irrigate with prior right to that of plaintiffs. Further than this, the hay land claimed to be irrigated in 1914 on these ranches is small in area in proportion to the pasture land.

It is urged also that the irrigation season commences April 1st, and not May 1st as found by the court, and that the estimate of water suited to the needs of defendant should be increased proportionately by reason thereof. The witnesses who have spoken on the subject agree that irrigation in previous years began on defendant's ranches about April 1st, and to this there seems to be no contradiction. The system in that time of the year was evidently by simply flooding these hay and grass lands. The witnesses also seemed to think that kind of use was beneficial in producing an increased amount of hay and grass, but it is certainly not the highest use to which it may be devoted, at any rate as it respects the irrigation of pasture.

Mr. Bark, who has made a study of irrigation, says:

"Up to a certain point the more water the more pasture, and it will require fully twice as much as for grains. I don't think I ever found the point in the pasture lands after which the application of more water would result in no increase, or an actual decrease, of the crop, because we never put water enough on. We have put about 4½ acre-feet on upland pastures and we still got more pasture."

The witness does not claim to have any scientific information as to the amount of water it would require for producing wild hay and pasture under conditions existing with respect to defendant's lands, where irrigation has been previously applied. He says, however:

"Under those conditions I think there is no method by which the amount of water so diverted upon the land could be measured, because it gets a lot of it by capillary attraction, subirrigation laterally."

A table was produced showing the duty of water for alfalfa. It was put in evidence, and shows a constantly increasing yield, as the water was applied in six divisions, beginning with 1.18 acre-feet and ending with 3.78 acre-feet to the acre. It will be observed in the fourth division, with the application of 2.61 acre-feet, there was produced 5.6 tons to the acre, with 2.14 tons to the acre-foot. The fifth division shows the application of 2.99 practically 3 acre-feet, with a production of 6.59 tons to the acre, or 2.20 tons per acre-foot. The sixth application was of 3.78 acre-feet, with a product of 6.8 tons per acre, and 1.8 tons per acre-foot. There was a constantly increasing soil moisture left at the close of the season, running from 10.08 to 19.44 per cent., except that in the fourth division there was 17.12 per cent. against 16.92 per cent. in division 5. Thus it is shown that there is a point where the economic application reaches its maximum utility. It appears by the fifth division that, by the application of approximately 3 acre-feet, 6.59 tons were produced to the acre, being 2.20 tons to the acre-foot; while the sixth division shows an increase in tonnage per acre, there is a substantial decrease per acre-foot. We may test the economic utility by supposing the grower was buying the water with which to irrigate his land. Would he pay for the increased supply and take the larger yield, and the less percentage of yield per acre-foot, or would he be contented with the smaller yield, as indicated by division 5, and pay more than proportionately less for the water? He would probably do the latter, since the larger yield is only about $^{2}/_{10}$ of a ton per acre above the smaller, while the increase of his water purchase would be about $^{78}/_{100}$ of an acre-foot to the acre. This demonstrates that the allowance of 3 acre-feet to the acre for alfalfa is as much, probably, as could be economically applied.

The witness Bark says that the water required for the irrigation of hay is about the same as for alfalfa. The experiment whereby the table was produced was evidently on upland. He says further, in effect, that if you keep putting more water into the soil and leaving more thereon at the end of the season, unless you have excellent drainage, you will water-log your land in a short time, and render it valueless.

Following the witness further, he is of the opinion that pasture needs about 10 light irrigations per year, extending from about April 1st to September 30th, or possibly into October. He explains that pasture is of shallow-rooted grass, and there is no need to soak it deep, but that a light irrigation should be oftener applied. A light irrigation, he further explains, is about 3 acre-inches, which, if reduced to acre-feet, there being 10 irrigations per season, would amount to 2½ acre-feet for that time.

"That method is adopted," says the witness, "on pastures that are grazed continuously during the summertime so as to keep up the growth of grass. I don't think it would require as much water, although I don't pose as an expert in that particular line, to produce a growth that was to be grazed off after the summer range has been exhausted, as it would if you had stock on it all the time. * * * It usually takes a little less water where the altitude is higher; there isn't so much evaporation, cooler nights, and the season is shorter."

Considering further, then, what is to be found in the discussion by this witness, as has been previously remarked, from the fact that defendant's hay and pasture lands lie low and approximately level, with the water table near the surface and the percolation from the streams and sloughs considerable, we are persuaded that 1½ acre-feet to the acre for the pasture lands, as allowed by the court, is quite sufficient for the economic irrigation of such lands.

There is another condition to be considered; that is, as the evidence seems to indicate, there is a time in June or early in July of each year when the water rises to such an extent that much of the land is flooded, notwithstanding the streams may be kept free from obstructions. These flood waters go to the benefit of defendant. The decree furthermore fixes no limitations upon the time of rise. So that defendant may use the water early or late, as it is disposed, so that it does not use more than the quantity prescribed during the season.

The findings of the court, as to the quantity of water to which the defendant is entitled prior in right to the plaintiffs, are therefore approved.

The defendant challenges the jurisdiction of the court to make provision in its decree as follows:

(a) That defendant must use the waters constituting its prior right only upon certain lands irrigated prior to 1907; (b) that it must install in its canals and ditches automatic measuring devices and refrain from the use of any water for the irrigation of its lands without the use of such devices; (c) that such measuring devices shall at all times be subject to the inspection of the plaintiffs, who shall have the right perpetually to go upon and over defendant's lands in Nevada for the purpose of such inspection; and (d) that the court retain jurisdiction to make rules touching the manner of diverting, measuring, and distributing the waters belonging to defendant in Nevada, and for directing that defendant "keep accurate and detailed records of the amounts of water diverted and to require reports to be filed from time to time of the amounts so diverted, and generally to make such orders as may be found reasonably necessary to give effect to the decree, and to appoint commissioners or watermasters to make distribution in accordance with its terms."

[11] The question is presented as to the extent to which the judgment and decree of a court exercising jurisdiction in one state may become operative in another. And, incidentally, it is urged that, as to the waters of streams which are interstate in character, their benefits should be equitably distributed between the states through which they flow. The thought comes from the suggestion of the court, in Kansas v. Colorado, 206 U. S. 46, 117, 27 Sup. Ct. 655, 51 L. Ed. 956, that

there might come a time when such a distribution would have to be made of the waters of the Arkansas river. A sufficient answer to the contention is that the pleadings and evidence in this case disclose no such condition as to require an equitable distribution of benefits of the waters of Salmon river and its tributaries between the states of Idaho and Nevada; and besides, the matter is one for adjustment between the states; it is not for individual users to raise a controversy about the use of such water in another state, out of the territorial jurisdiction of the court.

[12] As to the main question, this court has determined, by the case of Rickey Land & Cattle Co. v. Miller & Lux, 152 Fed. 11, 81 C. C. A. 207, that a suit of the nature here maintained is essentially one to quiet title to real property, and that it is local and not transitory. The Rickey Land & Cattle Company, in that case, set up certain rights in California that it claimed to the waters of the stream, and we held that its cross-complaint setting up such rights could not operate to defeat complainant's cause, but only defensively, "and not to give the defendant a right to have its title also quieted in the state of California." Hawley, District Judge, in the same case, on the trial in the District Court, had this to say:

"It [the court] cannot, by any decree which it may make in this suit, directly reach the dams, reservoirs, or ditches belonging to the defendant located entirely within the state of California." Miller & Lux v. Rickey [C. C.] 127 Fed. 573, 575.

In this expression of the law we concur. But has the plaintiff no remedy where a defendant has been personally served and appears in the court, and is enjoined forever from doing certain things in another state to the detriment of plaintiff's rights? The authorities are clear that he has. Such a remedy was sustained in the Rickey Land & Cattle Co. Case, supra.

But it is insisted here that the decree goes beyond the jurisdiction of the court to adjudge and provide. A court of chancery is without jurisdiction to give compensation for a nuisance or tort to real property lying in another jurisdiction or state, nor can it enjoin or restrain the continuance of such a nuisance. Northern Indiana R. Co. v. Michigan Cent. R. Co., 15 How. 233, 14 L. Ed. 674; Mississippi & Missouri R. Co. v. Ward, 2 Black, 485, 17 L. Ed. 311. Nor is it within the power of such a court to declare a deed to lands in another state null and void. Carpenter v. Strange, 141 U. S. 87, 11 Sup. Ct. 960, 35 L. Ed. 640.

[13] The reason assigned for the latter holding is that, while a court of equity may in a proper case compel a party to act in relation to property not within its jurisdiction, its decree does not operate directly upon the property, nor affect the title, but is made effectual through the coercion of the defendant. That is to say, the rem may not be affected by the direct operation of the decree where it is beyond the territorial jurisdiction of the court, but the court may, acting in personam, coerce action respecting it.

Massie v. Watts, 6 Cranch, 148, 3 L. Ed. 181, is illustrative as well as declarative of a like principle. The case was instituted in a Ken-

tucky court for the purpose of obtaining a conveyance of land in Ohio. Objection was made to the jurisdiction of the court to give the relief desired. Chief Justice Marshall, after premising that there was much reason for considering the action local in character and for confining it to the court sitting in the state where the lands lay, says:

"Was this cause, therefore, to be considered as involving a naked question of title, was it, for example, a contest between Watts and Powell, the jurisdiction of the circuit court of Kentucky would not be sustained. But where the question changes its character, where the defendant in the original action is liable to the plaintiff, either in consequence of contract, or as trustee, or as the holder of a legal title acquired by any species of mala fides practiced on the plaintiff, the principles of equity give a court jurisdiction wherever the person may be found, and the circumstance, that a question of title may be involved in the inquiry, and may even constitute the essential point on which the case depends, does not seem sufficient to arrest that jurisdiction."

After citing cases, among which was Penn v. Lord Baltimore, 1 Vez. 444, where the Chancellor of England decreed the specific performance of a contract respecting lands lying in North America, the distinguished jurist deduces the principle that:

"In a case of fraud, of trust, or of contract, the jurisdiction of a court of chancery is sustainable wherever the person be found, although lands not within the jurisdiction of that court may be affected by the decree."

The principle is rather more broadly stated in Phelps v. McDonald, 99 U. S. 298, 308 (25 L. Ed. 473), as follows:

"Where the necessary parties are before a court of equity, it is immaterial that the res of the controversy, whether it be real or personal property, is beyond the territorial jurisdiction of the tribunal. It has the power to compel the defendant to do all things necessary, according to the lex loci rei sitæ, which he could do voluntarily, to give full effect to the decree against him."

The principle, in its more comprehensive statement, was applied in Cole v. Cunningham, 133 U. S. 107, 10 Sup. Ct. 269, 33 L. Ed. 538, which was a suit by a citizen of Massachusetts to enjoin a defendant, a resident of the same state, from prosecuting an attachment and garnishment in the state of New York involving the property of complainant.

The principle was also applied by this court in Rickey Land & Cattle Co. v. Miller & Lux, supra, and was later applied in the Salton Sea Cases, 172 Fed. 792, 820, 97 C. C. A. 214. The latter cases were instituted in the superior court of California, and removed into the Circuit Court of the United States for the Southern Division of the Southern District of California, to restrain in one phase of the controversy the diversion of water in Mexico, which was beyond the territorial jurisdiction of the court. Among others, the decree contained the following provisions:

"That defendant be perpetually enjoined and restrained from diverting from the Colorado river any of the waters thereof, in excess of the substantial needs of the people dependent upon the canal, described in complainant's bill of complaint, for water supply for domestic and irrigation uses and purposes, and such other lawful purposes as the same may be applied to. * * *

"That the said water so diverted, whatever may be the amount, shall be so controlled and used that the same shall not flow upon the lands of the complainant described in the bill of complaint. * * *

"That the defendant be required to regulate the flow of any water that may be diverted by it so that there shall be no waste water flowing therefrom as the result of such diversion upon or over the lands of complainant, above-described.

"That said defendant be restrained from turning out of its canals any waste water at any point whence the same will naturally flow upon or over the lands of complainant, or flow into the lake now covering the Salton Sink, and thereby substantially increase the amount of water therein, or maintain the amount of water therein, or prevent the decrease thereof by natural causes."

By the second and last of the Salton Sea Cases, which was in the nature of a proceeding for contempt for violating these provisions of the decree, the provisions were themselves in effect approved, although they were designed to be effective in Mexico outside of the territorial jurisdiction of the court. The object of the cases was to prevent the continuation of a nuisance being perpetrated in Mexico as well as in California, causing damage to the complainant's properties in California.

[14] Now, turning to the case in hand, the decree complained of goes but little further, if any, than that part of the decree above set out in the Salton Sea Cases. It is true that the trial court has confined the use of the water to be diverted by defendant, to which it has a right superior to that of the plaintiffs, to such lands as were irrigated prior to 1907. This is setting bounds to the territorial use of the water. Ordinarily, one having obtained the right to prior use of a given quantity of water is not restricted as it respects the place of its use, and may change it to a different locality from that where first applied. He may also change the point of diversion and the character of its use if the rights of others be not affected thereby. Union Mill & Mining Co. v. Dangberg (C. C.) 81 Fed. 73, 115.

[15] In the case at bar there is a special reason for confining the use of defendant's prior right to the lands irrigated prior to 1907. By the estimate of the trial court, in which we concur, if the 12,500 acre-feet of water is used upon such lands, by reason of percolation 8,500 acre-feet would find its way back into the stream, and the loss to the plaintiffs would amount to about 4,000 acre-feet only. If, however, the whole of the 12,500 acre-feet was carried away to another locality, where it would all be absorbed and none of it would reach the channel of the river again, the loss to the plaintiffs would be that much greater. The real condition is, when the plaintiffs' rights are consulted, that the defendant's absolute appropriation prior in time to that of plaintiffs is the 4,000 acre-feet only, because the remainder of the 12,500 feet is returned to the stream after use. So that, if the defendant is to have the use of 12,500 acre-feet of water superior in right to that of plaintiffs, in justice and equity its use should be confined to that particular locality where it was being used when plaintiffs acquired their appropriation.

Now, if the court has not the power, proceeding in personam, to restrict the defendant's use of the water to a circumscribed locality,

it would be practically powerless to do justice between the parties litigant. We are convinced, however, from the authorities above considered, that it has such power in ample scope to protect the plaintiffs from the diversion of the water to any locality where it would conduce to their injury. It will be noted that the decree does not attempt to describe the exact metes and bounds of the lands to which defendant's appropriation was first applied, or was being applied at the time of plaintiffs' appropriation, but declares only that the same is included within certain legal subdivisions which embrace a very much enlarged territory as compared with that upon which appropriations were actually made, the purpose being to confine the use of the water to certain definite delimitations, with a view to preventing its being carried away to localities where the result would be to lessen the flow in the stream, to the detriment of plaintiffs. There is no attempt by the decree to quiet the defendant's title to its appropriations, but only to determine what they were and to what lands applicable, with a view to doing justice between the parties.

[16] It is furthermore necessary, to protect the plaintiffs against the encroachments of defendant, that the water be measured. The proper measurement is a duty personal to the defendant. It was altogether appropriate, therefore, that the court impose upon the defendant the obligation of installing automatic measuring devices, and, for the protection of the plaintiffs, these should be subject to their inspection. So it is respecting rules regulating the manner of diverting, measuring, and distributing the water and the keeping of records of the amount of water diverted, etc. These were all directions of the court operating in personam, and not directly upon the res, and were and are within the court's equitable jurisdiction to determine and declare.

[17] It is also assigned as error that the court quieted title in plaintiffs to more than 45,000 acre-feet of the waters of Salmon river. This feature of the controversy is regulated by the laws of Idaho. Sess. Laws 1915, p. 216. Under a project like this, 10 years is allowed within which to make the diversion and proof thereof for a beneficial use. The appropriation is contingent upon the use, of course, but in the larger projects the appropriation speaks as of the date of the license, though if not applied to a beneficial use within 10 years, it lapses. In the meantime no one will be deprived of the use of the water not reduced to a beneficial use under the project.

Another assignment of error relates to the refusal of the court to admit certain testimony. We have carefully examined the matter, and find no merit in the assignment.

The decree will be affirmed.