**UNITED STATES of America,**
**Appellant,**

v.

**AHTANUM IRRIGATION DISTRICT**
**et al., Appellees.**

**No. 14714.**

United States Court of Appeals
Ninth Circuit.

July 10, 1956.

J. Lee Rankin, Asst. Atty. Gen., William H. Veeder, David R. Warner, Attys., Dept. of Justice, Washington, D. C., for appellant.

Fred C. Palmer, Yakima, Wash., Charles L. Powell, Kennewick, Wash., J. W. McArdle, E. C. Prestbye, Spokane, Wash., for appellee.

Don Eastvold, Atty. Gen. of Washington, E. P. Donnelly, Asst. Atty. Gen., for intervening appellee, State of Washington.

Before POPE, LEMMON and CHAMBERS, Circuit Judges.

POPE, Circuit Judge.

This is a suit brought by the United States as trustee for the Yakima tribe of Indians to establish and quiet title to the Indians' right to the use of the waters of Ahtanum Creek in the State of Washington, which right is alleged to have been reserved by the treaty of June 9, 1855 between the United States and the Confederated Tribes of Yakima Indians.[1] This was the treaty by which the Yakima Indian reservation was set aside for the Indians. The defendants in the main are the non-Indian owners of lands outside the reservation who had appropriated or claimed rights to the use of the waters of the stream which formed the northern boundary of the reservation.[2]

Holding that the United States had not proved that it, as trustee or otherwise, had any right, title or interest in any water of Ahtanum Creek,[3] the trial court

---

1. The treaty appears at 12 Stat. 951. It was ratified by the Senate March 8, 1859.

2. Also named are certain so-called "Class Three Defendants" who are individual owners of irrigable land within the Indian reservation boundaries and who are the successors in interest to the Indian allottees whose allotments were patented in fee simple and subsequently sold to these defendants.

3. Conclusion of Law. (1). "That plaintiff has not proved that the United States, as trustee or otherwise, has any right, title or interest in any water of Ahtanum Creek as appurtenant to the Reservation as a whole or appurtenant to any parcel or collection of parcels located thereon by virtue of any reservation, express or implied, in the Treaty of 1855 or otherwise or at all."

dismissed the action and the complaint on the merits.

The complaint sets out the treaty whereby a certain tract of land in the then Territory of Washington was set aside and reserved for the use of the Yakima tribe as a home and abiding place of the Indians. It alleged that in view of the purposes of the treaty, its intention to encourage the Indians to give up their nomadic habits and to till the soil, and also in view of the arid character of the lands within the reservation which required irrigation for successful cultivation, the treaty operated to reserve sufficient waters of Ahtanum Creek for the Indians' needs, both present and future. The complaint further alleged that on May 9, 1908, "in direct violation of the rights * * * reserved to the Yakima tribe", the then chief engineer of irrigation, Bureau of Indian Affairs, entered into an agreement with certain white water users whose lands were situated outside of the reservation, whereby they were to have and be entitled to 75 percent of the natural flow of Ahtanum Creek and the Yakima Indians were to have the remaining 25 percent of that stream's natural flow. There was added to the prayer for an adjudication of the rights of the parties to the use of the stream waters, a prayer that the court adjudge this agreement of May 9, 1908 to be invalid and of "no force and effect".

The court held: 1, that there was no reservation of any water rights by the Treaty of 1855;[4] 2, that in any event the agreement of 1908 gave the white owners nothing that they did not already own;[5] and 3, that an adjudication in the courts of the State of Washington in 1925 determining the rights of the white landowners outside of the Indian reservation to the 75 percent of the natural flow of the stream, had been "encouraged" by the United States, and thus the United States was thereby barred from claiming any part of this 75 percent.[6] Accordingly, the court concluded that the cause should be dismissed.

In view of the action taken in the court below, it is apparent that we must consider the following questions, all of which are raised by the Government's specification of errors.

First, were any rights to the use of any of the waters of Ahtanum Creek reserved by the Treaty of 1855? If there were none, then the question of the validity of the agreement of 1908 need not be discussed.

Second, if it be concluded that by the treaty of 1855, rights to the use of the waters of Ahtanum Creek were reserved for the benefit of the Indians, were the rights thus reserved any greater than the 25 percent of the natural flow of the stream? If the rights of the Indians, as reserved, did not exceed the 25 percent

Conclusion of Law (4). "That plaintiffs have not proved that the Yakima Indian Nation, the Confederated Tribes of Yakima Indians, any Indian ward or allottee, or any person owning or occupying land on the Yakima Indian Reservation has any right, title or interest in any water right in Ahtanum Creek by virtue of any reservation in the Treaty of 1855, by reason of the fact that the Reservation borders on Ahtanum Creek, or because of any appropriation and beneficial application of any waters of Ahtanum Creek."

4. Finding of fact No. 5: "That there was no reservation of any water rights to Ahtanum Creek by the Treaty of 1855, either express or implied, to the United States or to the Confederated Tribes, or to individual Indians, adverse to defend-

ants. That defendants owning lands north of the Ahtanum have not infringed upon any water rights of the United States, the Confederated Tribes, or individual Indians under the proof herein."

5. "We are of the opinion that [the Secretary] did nothing but recognize the limitations set by practice upon the usage of water on the reservation and confirm the grants to the owners outside." 124 F.Supp. 818, at page 835.

6. Conclusion of Law (7). "That in 1926 the State of Washington, which then had jurisdiction over the waters of Ahtanum Creek, adjudicated all claims to 75% of the flow of Ahtanum Creek, which proceeding binds the United States and bars any claim to that portion of the flow."

allocated to them in 1908, it would appear that no serious question can be raised as to the validity of that agreement.

Third, if the rights reserved for the Indians by the treaty were of the extent and size claimed by the United States, that is to say, rights to sufficient waters for the needs of the Indians as they might exist in the future, then we must of necessity consider the validity and force of the 1908 agreement, for it is conceded that the present needs of the Indians are sufficient to require substantially the whole flow of the stream. If the agreement purported to deprive the Indians of rights which actually belonged to them, then that circumstance must be considered in determining whether the Government officials in executing it exceeded their power and authority.

■ That the Treaty of 1855 reserved rights in and to the waters of this stream for the Indians, is plain from the decision in Winters v. United States, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340. Apart from the date of the treaty discussed in that case, the facts there are practically identical with those which attended the treaty of 1855 with the Yakima tribes. In the Winters case, as here, the reservation was created by treaty; the reserved lands were a part of a much larger tract which the Indians had the right to occupy; and the lands were arid and without irrigation practically valueless. In the Winters case the Milk River was designated as the northern boundary of the reservation. This court, in its decision, 143 F. 740, 746, which the Supreme Court was af-

firming, had said: "We are of opinion that it was the intention of the treaty to reserve sufficient waters of Milk river, as was said by the court below, 'to insure to the Indians the means wherewith to irrigate their farms,' and that it was so understood by the respective parties to the treaty at the time it was signed." The attempted efforts to distinguish the Winters case from this one, are without force.[7]

■ It is true that the Yakima treaty described the Ahtanum as the north boundary of this reservation, whereas the boundary of Fort Belknap reservation in the Winters case was described as beginning at a point in the middle of the main channel of Milk River. But a tract of land bounded by a nonnavigable stream is deemed to extend to the middle of the stream. Hirt v. Entus, 37 Wash. 2d 418, 428, 224 P.2d 620.[8] The suggestion that much of the water of the Ahtanum Creek originates off the reservation is likewise of no significance. The same thing was true of the Milk River in Montana; and it would be a novel rule of water law to limit either the riparian proprietor or the appropriator to waters which originated upon his lands or within the area of appropriation. Most streams in this portion of the country originate in the mountains and far from the lands to which their waters ultimately become appurtenant.

No significance attaches to the early date of this treaty for the record is plain that some irrigation from the Ahtanum had begun in this valley before 1855 in which the Indians had participated. It is true that this early use was on the north side of the Creek, but they then

7. The suggestion that the Yakima treaty differs from that of the Fort Belknap Indians because of its earlier date, when irrigation was not so common, is without force. As hereafter noted, Indians were making some use of the Ahtanum waters for irrigation before 1855. Unanswerable is the statement of a witness before the Commission studying the Yakima river rights: "Among other things, for instance, the Indian Department was to maintain an agricultural school to

teach these Indians agriculture. What for? Why, they could not raise a bean without irrigation." P. 117, Senate Document 337, referred to infra note 11a.

8. The course of this boundary is described in the treaty as follows: "Commencing on the Yakama River, at the mouth of the Attah-nam River; thence westerly along said Attah-nam River to the forks; thence along the southern tributary to the Cascade Mountains; * * *."

had occupancy of both sides, and we cannot assume that when they agreed to move to the south side of the Creek they surrendered all rights to use of the water. As in the Winters case, we must answer in the negative the questions there posed: "Did they give up all this? Did they reduce the area of their occupation and give up the waters which made it valuable or adequate?" As was said in the Winters case, 207 U.S. 564, 576, 28 S.Ct. 207, 211, 52 L.Ed. 340: "The reservation was a part of a very much larger tract which the Indians had the right to occupy and use, and which was adequate for the habits and wants of a nomadic and uncivilized people." When the Indians agreed to change their nomadic habits and to become a pastoral and civilized people, using the smaller reservation area, it must be borne in mind, as the Supreme Court said of this very treaty, that "the treaty was not a grant of rights to the Indians, but a grant of right from them—a reservation of those not granted." United States v. Winans, 198 U.S. 371, 381, 25 S.Ct. 662, 664, 49 L.Ed. 1089. Before the treaty the Indians had the right to the use not only of Ahtanum Creek but of all other streams in a vast area. The Indians did not surrender any part of their right to the use of Ahtanum Creek regardless of whether the Creek became the boundary or whether it flowed entirely within the reservation.[9]

This brings us to a discussion of the question of quantum of waters reserved. It is obvious that the quantum is not measured by the use being made at the time the treaty reservation was made. The reservation was not merely for present but for future use. Any other construction of the rule in the Winters case would be wholly unreasonable. This matter was directly passed upon in Conrad Inv. Co. v. United States, 9 Cir., 161 F.

829, decided shortly after the Winters decision. This court was there undertaking to follow and apply that decision. It said, 161 F. at page 832: "What amount of water will be required for these purposes may not be determined with absolute accuracy at this time; but the policy of the government to reserve whatever water of Birch creek may be reasonably necessary, not only for present uses, but for future requirements, is clearly within the terms of the treaties as construed by the Supreme Court in the Winters case." The trial court's decree in that case, which this court affirmed, enjoined the interference with a specified quantity of water presently diverted and used for the benefit of the Indians on the reservation. This was 1666⅔ inches, but the decree contained a further provision to the effect that the Indians were to be protected in respect to their future increased needs. This portion of the trial court's decree was expressly approved by this court in the following language, 161 F. at page 835: "It is further objected that the decree of the Circuit Court provides that, whenever the needs and requirements of the complainant for the use of the waters of Birch creek for irrigating and other useful purposes upon the reservation exceed the amount of water reserved by the decree for that purpose, the complainant may apply to the court for a modification of the decree. This is entirely in accord with complainant's rights as adjudged by the decree. Having determined that the Indians on the reservation have a paramount right to the waters of Birch creek, it follows that the permission given to the defendant to have the excess over the amount of water specified in the decree should be subject to modification, should the conditions on the reservation at any time require such modification."

9. The Winters case settled the proposition that the treaty's failure to use the word "irrigation" was without significance. As an indication as to what streams the treaty recognized as exclusively for the Indians, note the following treaty provision: " 'The exclusive right of taking fish in all the streams, where *running through or bordering said reservation,* is further secured to said confederated tribes and bands of Indians * * *.' " (Emphasis added.)

At the time of the making of the treaty construed in the Winters case, it is plain there was little or no irrigation then being carried on by the Indians. As the Supreme Court pointed out, until that time they were a nomadic people. As was suggested by this court when that case was here, the Indians "might not have known the exact meaning of the word 'irrigation' had it been used in the treaty." No one even thought in the Winters case that the rights of the Indians to the use of the water reserved should be limited to the quantities used at the date of the treaty. The implied reservation looked to the needs of the Indians in the future when they would change their nomadic habits and become accustomed to tilling the soil.

It is plain from our decision in the Conrad Inv. Co. case, supra, that the paramount right of the Indians to the waters of Ahtanum Creek was not limited to the use of the Indians at any given date but this right extended to the ultimate needs of the Indians as those needs and requirements should grow to keep pace with the development of Indian agriculture upon the reservation. Some effort is made here to assert that the reservation of waters for the benefit of the Indians must be limited to the amount or quantity actually used beneficially by the Indians within some period of time or within what the court might find to be a reasonable time. Thus, it is argued that since at the time of the 1908 agreement the area of land on the reservation then under irrigation through the Indian ditches did not exceed some 1200 acres, that the rights of the Indians were limited by those needs.

This argument, as we shall later note, is used as the basis for a contention that the 1908 agreement adequately provided for all rights of the Indians, since their rights were limited to the use of this 1200 acres. Nothing in the Winters case or in any other decided case lends any support to such an argument. As indi-cated, exactly the contrary was held in the Conrad Inv. Co. case, supra. Between 1908 and 1915 the Indian Irrigation Service was engaged in the work of constructing and extending irrigation canals and ditches with headworks and means of diversion so that by 1915 the Indian lands upon the reservation susceptible of irrigation from Ahtanum Creek amounted to approximately 5000 acres. Had there been no 1908 agreement, it seems plain that as of 1915 it would have to be said that the rights reserved in the treaty were rights to the use of water from this stream sufficient to supply the needs of this 5000 acres.

When the complaint in the Winters case was filed approximately 5000 acres of land were then being irrigated upon the Fort Belknap reservation. The waters were diverted and distributed by means of a canal with a carrying capacity of 5000 inches of water, and such amount of water was required for the then needs and requirements of the Government and the Indians.[10] The record here shows that an award of sufficient water to irrigate the lands served by the Ahtanum Indian irrigation project system as completed in the year 1915 would take substantially all of the waters of Ahtanum Creek. It does not appear that the waters decreed to the Indians in the Winters case operated to exhaust the entire flow of the Milk River, but, if so, that is merely the consequence of it being a larger stream. As the Winters case, both here and in the Supreme Court, shows, the Indians were awarded the paramount right regardless of the quantity remaining for the use of white settlers. Our Conrad Inv. Co. case, supra, held that what the non-Indian appropriators may have is only the excess over and above the amounts reserved for the Indians. It is plain that if the amount awarded the United States for the benefit of the Indians in the Winters case equaled the entire flow of the Milk River, the decree would have been no different.

10. See statement of facts, 143 F. 741.

United States v. Walker River Irr. Dist., 9 Cir., 104 F.2d 334, was another case in which this court applied the doctrine of the Winters case and recognized the right of the Indians upon the reservation there involved, to the use of water to the extent reasonably necessary to supply their needs. The Walker River Indian reservation was an early one, initiated in 1859. At that time, as this court pointed out, the Indians "unskilled in the art of farming, would necessarily make slow progress * * *. The extent to which the use of the stream might be necessary could only be demonstrated by experience." 104 F.2d at page 339. At any rate by 1886 some 1900 acres were under cultivation and at the time of the trial this area had not substantially increased and the number of Indians was not increasing. This court accepted the master's report and his estimate of the needs of the Government "as demonstrated by 70 years' experience," and made the recommended award for water sufficient to irrigate 2100 acres. It is unnecessary to consider whether, had there been no 1908 agreement, the rights of the government as trustee for the Indians would have been constantly growing ones in the years following 1915 had the irrigable area within the reservation continued to increase. It is sufficient for the purposes of this case to say that an adjudication of the rights of the United States in and to the waters of Ahtanum Creek as of 1915, would necessarily award the United States a right measured by the needs of the Indian irrigation project at that date.

The assertion that any reservation of waters for the benefit of the Indians must be limited to the amount or quantity actually used beneficially within some period which the court might find to be a reasonable time, is accompanied by a suggestion that a reasonable time limitation would terminate in 1908. We find no basis for this. We deal here with the conduct of the Government as trustee for the Indians. It is not for us to say to the legislative branch of the Government that Congress did not move with sufficient speed to appropriate the funds necessary to complete this irrigation system by 1908 rather than by 1915, or that the Government had thus lost or forfeited the rights reserved for the Indians.

We next notice the court's conclusion that a 1925 state court adjudication of the respective rights of the white landowners as between themselves to the 75 percent of the flow of Ahtanum Creek, which had been allotted to them in the 1908 agreement, was a proceeding "which binds the United States and bars any claim to that portion of the flow." This refers to the proceeding reviewed in In re Water Rights in Ahtanum Creek, 139 Wash. 84, 245 P. 758. There the non-Indian, non-reservation users of waters from Ahtanum Creek procured an adjudication of their relative rights. The United States was not a party to that suit, although as the pretrial order recites, it had knowledge that the adjudication was proceeding and it had an opportunity to appear therein but decided against it. It is too clear to require exposition that the state water right decree could have no effect upon the rights of the United States. Rights reserved by treaties such as this are not subject to appropriation under state law, nor has the state power to dispose of them. Federal Power Comm. v. State of Oregon, 349 U.S. 435, 444, 75 S.Ct. 832, 99 L.Ed. 1215.

This brings us to the crucial question in the case,—the question of the validity and effect of the 1908 agreement.

On August 18, 1906, one David Munn, as plaintiff, filed in the Superior Court of Yakima County, Washington, a complaint against W. H. Redman and others. The complaint alleged that the plaintiff had rights to the waters of Ahtanum Creek; that the defendants named were wrongfully diverting water from the Creek, and prayed for an injunction against them. Redman was an employee of the United States and was an Indian Irrigation Service engineer. The Indian Service was then in the process of

enlarging the irrigation ditches on the reservation. Redman was sued as an individual. With the approval of the Attorney General, the United States Attorney at Spokane, Washington, entered an appearance for Redman, not as attorney for the Government, but as attorney for Redman. The filing of this suit led to a considerable volume of correspondence between the United States Attorney and the Attorney General and between the Secretary of the Interior and the officials of the Indian Irrigation Service. Counsel for the plaintiff offered to dismiss the case if the United States would file a bill in equity to settle questions relating to rights to the waters of Ahtanum Creek. Such a bill in equity was prepared by the United States Attorney and approved by the Attorney General. For some reason not apparent from the record, it was not filed,[11] and in the latter part of October, 1907, the Superintendent of the Indian Agency was directed by the Commissioner of Indian Affairs to begin conferences with counsel who had filed the Munn suit to see if an adjustment of the rights to use of the water could be made out of court.

In the spring of 1908 Chief Engineer Code of the Indian Irrigation Service was directed to go to the reservation to confer with a committee of white water users for the purpose of bringing about a settlement of the rights to the use of the Ahtanum water. The upshot of this was the execution of the agreement dated May 9, 1908 between the United States, acting through Code and a large number of named white users of water from Ahtanum Creek on lands located outside the reservation. The gist of the agreement was in its article I reading as follows: "The party of the first part agrees to limit and define its claim to the waters of Ahtanum Creek and its tributaries as twenty-five percent (25%) of the natural flow of said Creek, and the party of the second part agrees to limit and define its total and aggregate claim to the said waters as seventy-five per cent (75%) of the said natural flow of said stream, each party hereto surrendering and conceding to the other party all rights heretofore claimed in the said waters in excess of the amounts herein named." The remainder of the agreement dealt with methods of measuring the water in the creek, the manner of diversion, the installation of headgates and the designation of a ditch master. It was signed by Code on behalf of the United States and by the attorneys in fact for the white landowners, and on June 30, 1908 it was approved by Frank Pierce, First Assistant Secretary of the Interior.[11a]

11. On August 8, 1907, the Secretary of the Interior requested a copy of the bill. This was furnished by the Attorney General on August 10. Two days later, on August 12, the Attorney General wired the United States Attorney in Spokane telling him not to file the bill until further notice.

11a. The record contains copies of the official correspondence within the Interior Department and between that Department and the Department of Justice relating to the negotiations which led to the execution of this agreement. In the fall of 1907 Mr. Code transmitted to the Secretary a report of his investigation on the reservation and of his views concerning a possible compromise of claims respecting waters of Ahtanum Creek. His recommendation was a compromise agreement involving a division of the waters based upon the relative areas then actually irrigated by the Indians on the south side and the white settlers on the north. He estimated that at that time 1500 acres were irrigated on the Indian side and 5500 acres on the white side, and he recommended an attempt to adjust on the basis of one-third of the waters to the Indians and two-thirds to the white settlers. He referred to the "recent Montana decisions" and commented upon the possibility they would be sustained by the Supreme Court, but stated, "to a layman, it seems that, as between the early white settlers, who have made prior and beneficial use of the waters of a boundary stream, and the Government, which as guardian of the Indians' water rights, had not done so, the latter would be the party to make restitution to the Indians."

It does not appear that the Code agreement was submitted to any law officers of the Government for an opinion with respect to its validity prior to its execution and approval. In contrast with his

. While the execution of the agreement led to the dismissal of the Munn case and dispensed with efforts for the time being to prepare and file a suit on behalf of the United States to settle the water rights, the execution of the agreement did not serve to lay the whole matter at rest, for as we shall hereafter note, arguments with respect to the agreement and its validity, and with respect to whether the parties thereto were or were not complying therewith, continued to rage for the next 30 years.[12]

This brings us to the heart of this case and the primary question involved, namely, the problem of the validity of

layman's opinion as to the law, the attorney who represented the white landowners in dealing with Code, later testified: "I advised my clients that the Indian land was entitled to sufficient water to irrigate it. We tried to make the best bargain we could with the Secretary of the Interior, and we did." Senate Document 337, 63d Cong., 2nd Sess., Dec. 20, 1913, p. 117.

12. In the year 1912 individual Yakima Indians began writing to the Attorney General urging the institution of a suit to determine the rights of the Indians both in the Yakima River and in Ahtanum Creek. They asserted that the agreement mentioned limiting the Indians to one-fourth of the Ahtanum Creek and the other agreement limiting the Indians to 147 cubic feet of water from the Yakima River amounted to robbery of the Indians and was "damn shame defendants stealing from poor Indians." The matter was referred by the Attorney General to the Secretary of the Interior who recommended that court proceedings should not be instituted because there was pending in Congress a bill which, if passed, "will restore to the Yakima Indians the water rights to which they are entitled under the Treaty of 1859." (Attached was correspondence relating to a prior Secretary's limitation of the Indian rights in the Yakima River which the Secretary states was "less than the Indians are fairly entitled to and reasonably need.")

That material, and the proposed bill did not refer to the Ahtanum waters. A Department of Justice memorandum signed "C.S.E." recites, "I have gone into this matter with considerable care and am impressed with the legal soundness of the argument presented by the Yakima Indians, but the Interior Department is responsible for whatever action detrimental to their rights has been taken * * *." The Indians were advised that no proceedings would be instituted at that time.

On November 2, 1918, the Superintendent on the Yakima reservation advised the Commissioner of Indian Affairs that white users along the Ahtanum were not living up to their side of the agreement of 1908; that control works and measuring devices as required by that agreement had not been provided by the whites, and the superintendent understood that he was not obliged to live up to the agreement either since the white users had failed to comply.

In 1923, the Chief Engineer in charge of Indian Irrigation recommended to the Commissioner consideration of an action to adjudicate the rights in Ahtanum Creek. Further petitions requesting an adjudication were received from the Indians and on July 5, 1927, the then Commissioner of Indian Affairs wrote to the Superintendent of the reservation referring to the decision of the court in the Winters case and to the Code agreement of 1908, and stated: "However, the provisions in that agreement were never observed or carried out and since that agreement was in its inception nothing more than a tentative understanding for use until such time as the disputed water rights might be determined by the court, and in view of the failure of the parties to observe its provisions, this office regards said agreement as of no effect whatever in the matter of determining the water rights to which the Indians are entitled." The superintendent was directed to see that the Indians received the quantity of water which they needed. This order was suspended at the request of Senator Jones of Washington, but there ensued and continued for several years thereafter extensive correspondence between the Ahtanum Irrigation District and the state Supervisor of Hydraulics of Olympia, Washington, on the one hand, and the Department of the Interior and Commissioner of Indian Affairs, on the other, respecting alleged excess diversions of the waters of Ahtanum Creek, and suggesting that the Secretary of the Interior undertake to investigate with a view to a settlement of the continuing pending dispute.

The correspondence shows that the white users constructed a dam across Ahtanum Creek; that this was torn out by the Indian Bureau and Indian police stationed to prevent its replacement.

the 1908 agreement. This is a most difficult question. The Code agreement is one practically without precedent.[13] No statute, executive order or departmental regulation made any provision for that sort of thing. There is no long continued practice in the executive department of the Government from which congressional acquiescence could be spelled out.[14] Nothing can be found in the way of an established usage, "which constituted the common law of the Department and fixed the duties of those engaged in its activities." United States v. Birdsall, 233 U.S. 223, 231, 34 S.Ct. 512, 514, 58 L.Ed. 930. The agreement was approved by the First Assistant Secretary of the Interior. Nothing turns upon the fact that the approval was executed by an Assistant Secretary rather than by the Secretary himself. Under like circumstances it has been held that the act of an Assistant Secretary must be presumed to be within the

This matter was called to the attention of the Attorney General by First Assistant Secretary of the Interior Dixon by letter dated January 25, 1930. The Attorney General was advised that there was need for immediate action, and an investigation was asked. The Attorney General had an investigation made by the Federal Bureau of Investigation and on December 30, 1930, he transmitted the report of the investigation to the Secretary of the Interior. Attached to the report was a copy of a letter from the Solicitor for the Interior Department dated June 7, 1929, addressed to the Secretary, and expressing the view that the Code agreement of 1908 was valid and within the authority of the Secretary of the Interior to execute. The letter of transmittal, signed by Attorney General William D. Mitchell, stated: "I am not aware of any authority authorizing the Secretary of the Interior or any officials of the Government under him to enter into a compromise settlement of controversies such as are here mentioned, whether the same be effected as a compromise of a suit or otherwise."

On May 12, 1931, First Assistant Secretary Dixon wrote to the Attorney General that none of the parties would be satisfied until a court decision in the matter in dispute had been rendered, and requested the Attorney General to institute a suit to quiet title to the waters of Ahtanum Creek. The Attorney General directed the United States Attorney at Spokane to prepare a bill of complaint for that purpose. There followed telegrams from Senator Jones to the President stating that it was imperative that orders be issued stopping any judicial proceeding and transmitting a copy of a telegram from the Secretary of the Ahtanum Irrigation District advising that matters had been adjusted for the current season. The Secretary of the Interior, being advised that a working agreement had been reached respecting the water for the season of 1932, recommended that the institution of the suit to adjudicate the rights be delayed.

On October 2, 1933, Secretary of the Interior Ickes requested the Attorney General to proceed with the suit to settle the conflict over the Ahtanum Creek water rights. Washington Senator Dill wired the Commissioner of Indian Affairs suggesting that the proposed suit be called off, and transmitted a copy of the letter to him from the Secretary of the Ahtanum Irrigation District urging such non-action.

In June, 1938, United States Attorney Driver requested authority to institute a suit to adjudicate the rights to the use of water of Ahtanum Creek. This was followed by his submission of a proposed bill of complaint for this purpose. There followed letters from the Secretary of the Ahtanum Irrigation District to Senators Schwellenbach and Bone urging them to take steps to prevent the institution of this suit. This letter was transmitted by the Senators to the Attorney General.

By Senate Resolution dated July 18, 1939, the Attorney General was requested to stay these proceedings until the Secretary of the Interior could report on the feasibility of supplementing the supply of water in Ahtanum Valley. The Secretary of the Interior reported on July 21, 1942, pursuant to the Senate Resolution, that the proposed project to procure additional water was not feasible.

13. The only prior instance of such an agreement on the part of the Secretary was that made by Secretary Hitchcock in 1905, agreeing to limit these Indians' rights to Yakima River water. It is referred to infra.

14. United States v. Midwest Oil Co., 236 U.S. 459, 469, 35 S.Ct. 309, 59 L.Ed. 673; cf. Sioux Tribe v. U. S., 316 U.S. 317 at page 326, 62 S.Ct. 1095, 86 L. Ed. 1501.

scope of the authority which the Secretary conferred upon his Assistant. Parish v. United States, 100 U.S. 500, 504, 25 L.Ed. 763; United States v. Peralta, 19 How. 343, 347, 15 L.Ed. 678; Norris v. United States, 257 U.S. 77, 81, 82, 42 S.Ct. 9, 66 L.Ed. 136.[15] In inquiring whether the Secretary of the Interior himself had power or authority to enter into such an agreement, it is noted that at that time, the powers granted to the Secretary of the Interior, so far as Indians and Indian rights were concerned, were stated in very general terms, as follows:

"Sec. 441. The Secretary of the Interior is charged with the supervision of public business relating to the following subjects: * * * Third. The Indians." R.S. § 441, see 5 U.S.C.A. § 485.

"The Commissioner of Indian Affairs shall, under the direction of the Secretary of the Interior, and agreeably to such regulations as the President may prescribe, have the management of all Indian affairs and of all matters arising out of Indian relations." R.S. § 463, now 25 U.S.C.A. § 2.[16]

It is suggested that whatever may have been the initial force and effect of the 1908 agreement, that subsequent official acquiescence in the agreement and the performance thereof, and administrative interpretations of the applicable statutes as giving the Secretary power to approve the agreement, operated in some manner to ratify the arrangement. It is contended that the contemporaneous construction of the applicable statutes by those charged with the execution thereof, especially when it has long prevailed, is entitled to great weight.

A thorough search of the reports made to Congress by the committees dealing with appropriation of the funds which were used between the years 1908 and 1915 in completing the irrigation system designed to provide the 5000 acres with waters from Ahtanum Creek, fails to disclose any real evidence that Congress was reliably informed of this limiting agreement of 1908. If anything, the continued appropriations for such a sizeable irrigation system would suggest a lack of information on the part of Congress as to the 1908 agreement. So far as Congress is concerned, there is no evidence whatever that the members thereof had any information from the Department of the Interior with respect to this particular agreement prior to the year 1932 when a bill was introduced for the purpose of approving and ratifying the agreement.[17] This was a bill introduced by Senator Jones of Washington entitled "A Bill Approving and Confirming Contract For Apportionment of Waters of Ahtanum Creek, Washington, Between Yakima Indian Reservation And Lands North Thereof Dated May 9, 1908." Extensive hearings were held but the bill had rough going [18] and was not reported.

15. Provision for an Assistant Secretary of the Interior and of his performance of duties prescribed by the Secretary, was made in R.S. §§ 438, 439 (1873), 5 U.S.C.A. §§ 482, 483. 23 Stat. 497 (1885) provided for a First Assistant Secretary.

16. Appellees have cited as statutes having a bearing upon the authority of the Secretary to execute this agreement, Title 25 U.S.C.A. §§ 381 and 382. § 381, authorizing the Secretary to prescribe rules and regulations "necessary to secure a just and equal distribution [of water] among the Indians residing upon any such reservations", refers to regulations for distribution among the Indians themselves. See United States v. Powers, 305 U.S. 527, 59 S.Ct. 344, 83 L.Ed. 330. § 382 did not become effective until 1909 and it appears to provide merely for the irrigation of Indian lands in connection with projects undertaken under the Reclamation Act.

17. Hearing before the Committee on Indian Affairs, U. S. Sen., 72nd Cong., 1st Sess., on S. 3998 (erroneously called S. 3988). Some of the witnesses at the hearings before the Joint Congressional Commission which investigated Secretary Hitchcock's apportionment of Yakima River waters mentioned the Ahtanum agreement. Neither that investigation nor the report which followed dealt with the Ahtanum agreement. Report of Joint Congressional Commission, Document No. 337, 63d Cong., 2nd Sess.

18. "Senator Wheeler. Did the Indians agree to such a division at that time? Senator Jones. I do not think they did—

In 1905 Secretary of the Interior Hitchcock had undertaken to make an agreement limiting the rights of this same tribe of Indians to waters flowing in the Yakima River, and which were used on another portion of the same reservation. The Secretary undertook to limit the Indians' rights to 147 cubic feet per second. In 1913 a joint commission of the Senate and House visited that area and held hearings with respect to that agreement and to consider action designed to correct the wrongs claimed to have been done the Indians by the Secretary's agreement. The commission had before it a proposal to provide by congressional action additional water for irrigating these lands, known as the Wapato project, an area adjoining the Yakima River. The report (Document 337, footnote 11a, supra) was that the Secretary's allowance of 147 second feet for the use of the reservation lands "was when made and now is inadequate, inequitable, and unfair to said Indian Reservation." The result of that investigation was the passage of the Act of August 1, 1914, 38 Stat. 604, appropriating funds designed to provide in addition to the 147 cubic feet per second mentioned in the Secretary's stipulation, sufficient stored water to make an aggregate of at least 720 cubic feet per second, this to be in satisfaction of the rights of the Indians in the Yakima River. The Act recited that "the Indians * * * have been unjustly deprived of the portion of the natural flow of the Yakima River to which they are equitably entitled * * *." This congressional inquiry and the enactment was not concerned with the 1908 agreement, or with the Ahtanum waters; it dealt solely with the Wapato project and Yakima River waters. The enactment added up to a congressional disapproval of Secretary Hitchcock's action.

With respect to the departmental interpretations of the question of the Secretary's power or authority to approve the 1908 agreement, the material referred to in footnote 12, supra, sufficiently indicates that there was no clear or definite determination by the Interior Department, and such expression as the office of the Attorney General gave, questioned the validity of the 1908 agreement.

As early as 1885, the Attorney General advised the Secretary that the latter had no power to approve leases of Indian lands for grazing purposes. The opinion was based in part upon the provisions of what is now Title 25, § 177, prohibiting "purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians." 18 Op.Atty.Gen. 235, 238. While under date of June 7, 1929, Interior Solicitor Finney had advised the Secretary that "You would not now be justified in ignoring or attempting to repudiate the agreement entered into in 1908", yet as noted in footnote 12, supra, Attorney General Mitchell stated that he was not aware of any authority authorizing the Secretary of the Interior to enter into the arrangement mentioned. In addition to the 1927 direction of the Commissioner of Indian Affairs to the Superintendent of the reservation to disregard the 1908 agreement as being of no effect whatever, Commissioner Rhodes on March 22, 1932, recommended an unfavorable report on the House counterpart of the Senate bill proposing to ratify and approve the 1908

that is, individually. I do not think they had a council. They acted through the Secretary of the Interior." Senator Wheeler. "If they did not have a council, Senator, my contention has always been that the Secretary of the Interior and the Indian Bureau had no right to go ahead and act arbitrarily without the tribal council's consent, taking away water or land from these Indians and giving it to white settlers. * * * The

agreement, so far as I am concerned, has no force or effect." Hearings (supra note 17) pp. 18, 20. J. Henry Scattergood, Assistant Commissioner of Indian Affairs, appeared at the request of the committee and expressed his personal view, contrary to that of the Secretary, that the bill should not pass but that suit to determine the rights should be started by the Attorney General (p. 48).

**334**

agreement. He also stated the view of the Indian Service that the agreement was merely a temporary working understanding and not intended to be binding for the future as conditions changed. He referred to the pending drafting of a bill of complaint to adjudicate the questions involved, and thought that until the adjudication was complete there should be no effort to have Congress confirm the 1908 agreement.[19] While the then Secretary of the Interior thus ignored the Commissioner's recommendation, the succeeding Secretary of the Interior, on October 2, 1933, requested the Attorney General to proceed with the suit. See note 12, supra.

The record completely fails to support the contention of the appellees that there was any definite administrative interpretation of the Acts relating to the powers of the Secretary to the effect that under them such an agreement was a valid one. Rather it would appear the question was one under constant debate and dispute within the Department itself.

■ Of course, if the Secretary lacked the power to approve the 1908 agreement in the first place, neither he nor any of his subordinates could by subsequent conduct or approval, or by any action or failure to act, render valid that which was initially void. No defense of laches or estoppel is available to the defendants here for the Government as trustee for the Indian Tribe, is not subject to those defenses. Utah Power and Light Co. v. United States, 243 U.S. 389, 408–409, 37 S.Ct. 387, 61 L.Ed. 791; Cramer

v. United States, 261 U.S. 219, 234, 43 S.Ct. 342, 67 L.Ed. 622; United States v. Walker River Irr. Dist., supra, 104 F. 2d at page 339. "The Government, which holds its interests here as elsewhere in trust for all the people, is not to be deprived of those interests by the ordinary court rules designed particularly for private disputes over individually owned pieces of property; and officers who have no authority at all to dispose of Government property cannot by their conduct cause the Government to lose its valuable rights by their acquiescence, laches, or failure to act." United States v. State of California, 332 U.S. 19, 40, 67 S.Ct. 1658, 1669, 91 L.Ed. 1889. And in respect to the rights of Indians in an Indian reservation, there is a special reason why the Indians' property may not be lost through adverse possession, laches or delay. This, as pointed out, in United States v. 7,405.3 Acres of Land, 4 Cir., 97 F.2d 417, 422, arises out of the provisions of Title 25 U.S.C.A. § 177, R.S. § 2116, which forbids the acquisition of Indian lands or of any title or claim thereto except by treaty or convention.[20]

It is thus apparent that we are confronted with the necessity of passing upon the question whether the applicable statutes above quoted, by force of their own terms alone, and unaided by any established practice, or administrative ruling, regulation or interpretation from which acquiescence or implied approval by Congress might be implied, granted the Secretary power to make this agree-

19. Notwithstanding this recommendation from the Commissioner, Secretary Wilbur on the same date stated to the House Committee, "Unless I am prevented by court action, I propose to adhere to the agreement of 1908". He stated he had no objection to the proposed legislation. His lengthy letter takes notice of a question relating to the validity of the 1908 agreement but in listing questions in dispute, notes only questions that "relate to the interpretation of the agreement rather than to its validity."

20. So far as the Ahtanum Irrigation District is concerned, the considerations

which would ordinarily induce a court to be sympathetic to a plea of laches would not have full force here. While the record shows that in 1907, counsel for plaintiff Munn offered to dismiss that suit if the United States Attorney would file a bill on behalf of the United States, yet on later occasions when the filing of such a suit was proposed some of the Washington Senators were repeatedly induced by the District to intervene with the Department of Justice to urge that no suit be brought to adjudicate the water rights. Delay was not chargeable solely to the Government officials.

ment. The outcome of this suit is dependent upon our answer to that question.

The Government's contention is that the Secretary had no power to agree to hand over to others 75 percent of the waters actually reserved for the use of the Indians, in the absence of specific statutory authority so to do. There are cases which seem to point in that direction. Speaking of lands reserved by treaty for use of an Indian tribe, in Sioux Tribe v. U. S., 316 U.S. 317, 326, 62 S.Ct. 1095, 1099, 86 L.Ed. 1501, the Court said: "Since the Constitution places the authority to dispose of public lands exclusively in Congress, the executive's power to convey any interest in these lands must be traced to Congressional delegation of its authority." It has been said that the Secretary's power to dispose of public lands must be found in specific, not in general legislation relating to public lands as a whole. Hynes v. Grimes Packing Co., 337 U.S. 86, 109, 69 S.Ct. 968, 93 L.Ed. 1231. A similarly strict view with respect to the Secretary's power to deal with the property rights of individual Indians has been expressed.[21]

Neither of the sections of the quoted statutes relating to the powers of the Secretary makes any reference to agreements with respect to division of waters of streams bordering Indian reservations as between the Indians and the white settlers. The sections do in general language confer upon the secretary powers of supervision and of management. R.S. § 441 charges the Secretary with the supervision of public business relating to Indians, and R.S. § 463 states that the Commissioner of Indian Affairs under the Secretary's direction shall "have the management of all Indian affairs, and of all matters arising out of Indian relations."

It is fair to say that in conferring these powers upon the Secretary of the Interior Congress must have had it in mind that a part of the Secretary's task of supervision and of management of Indian affairs would necessarily deal with certain relations between the Indians on the one hand and their white neighbors on the other. The management of any parcel of land necessarily involves some degree of occasional adjustment of the rights of the owner in relation to and concerning adjoining landowners; arrangements for the location and erection of boundary fences, and repair and maintenance of those fences are illustrations of this. More specifically we have here the case of a stream which formed the boundary between the Indian reservation and the outside public lands, and which public lands were open to entry by white settlers. The rights of the white settlers to the use of the waters were subordinate to the rights of the Indians, but they were not nonexistent. Until the Indians were able to make use of the waters there was no legal obstacle to the use of those waters by the white settlers. And after the Indian irrigation works were completed, there would still be the right of the non-Indian appropriators to make use of any surplus available within the stream. Where the waters of a stream are subject to use by different landowners, the very use itself involves some accommodation between the parties. It is common knowledge that, particularly in the early days, many streams in the West were used by appropriators or by riparian owners long before the stream rights had been adjudicated, and prior to the establishment of any machinery for the appointment of water masters. That sort of thing involves a measure of dealing between water users. Authority to man-

21. "Since these Indians with the implied consent of the government had acquired such rights of occupancy as entitled them to retain possession as against the defendants, no officer or agent of the government had authority to deal with the land upon any other theory." Cramer v. United States, 261 U.S. 219, 234, 43 S.Ct. 342, 346, 67 L.Ed. 622. Cf. Arenas v. United States, 322 U.S. 419, 64 S.Ct. 1090, 88 L.Ed. 1363.

age property would normally comprehend dealings of this character.

At the time the 1908 agreement was made, disputes had begun to appear as to the proper division and distribution of the waters of Ahtanum Creek. Of course it was then open to the United States, although not to the white landowners, to start court proceedings designed to adjudicate the rights of the litigants. It is the view of this court that it could not have been within the contemplation of Congress that the Secretary, vested as he was with the general power of supervision and management of Indian affairs, and of matters arising out of Indian relations, could not make a peaceful arrangement for a practical mode of use of the waters of this stream. As early as 1833, the Supreme Court said in United States v. Macdaniel, 7 Pet. 1, 13–14, 8 L.Ed. 587:

> "A practical knowledge of the action of any one of the great departments of the government, must convince every person, that the head of a department, in the distribution of its duties and responsibilities, is often compelled to exercise his discretion. He is limited in the exercise of his powers by the law; but it does not follow, that he must show statutory provision for everything he does. No government could be administered on such principle. To attempt to regulate, by law, the minute movements of every part of the complicated machinery of government, would evince a most unpardonable ignorance on the subject. Whilst the great outlines of its movements may be marked out, and limitations imposed on the exercise of its powers, there are numberless things which must be done, that can neither be anticipated nor defined, and which are essential to the proper action of the government."

This principle has frequently been expressed in relation to the acts of the Secretary of Interior or the Commissioner of Indian Affairs. Thus in Rainbow v. Young, 8 Cir., 161 F. 835, 838, the court speaking through Circuit Judge Van Devanter, after citing United States v. Macdaniel, supra, said:

> "In our opinion the very general language of the statutes makes it quite plain that the authority conferred upon the Commissioner of Indian Affairs was intended to be sufficiently comprehensive to enable him, * * * to manage all Indian affairs, and all matters arising out of Indian relations, with a just regard, not merely to the rights and welfare of the public, but also to the rights and welfare of the Indians, and to the duty of care and protection owing to them by reason of their state of dependency and tutelage. And, while there is no specific provision relating to the exclusion of collectors from Indian agencies at times when payments are being made to the Indians, it does not follow that the commissioner is without authority to exclude them * * *."[22]

■ If, as we believe, it was appropriate and within the general powers granted, for the Secretary of the Interior to enter into a working arrangement as to how the waters of Ahtanum Creek were to be handled and distributed between the Indians on the one hand, and the white settlers on the other, the

22. "We do not forget that historically and traditionally the Secretary of the Interior has been selected as the executive arm of the Government to execute the declared Congressional policy with the Indians. As such, he and his subordinates have the responsibility of discharging the obligation of the Government to its Indian wards, and in that respect, he is given wide discretionary powers to deal with the individual Indians who are dependent upon the Government for tutelage and protection. * * * In the discharge of these duties, he acts as supervisor, agent, guardian, and trustee of the Indians and his property, whether in the nature of lands or restricted funds." United States v. Anglin & Stevenson, 10 Cir., 145 F.2d 622, 628, certiorari denied 324 U.S. 844, 65 S.Ct. 678, 89 L.Ed. 1405.

question arises whether the agreement made for this purpose becomes void and must be said to be beyond the powers of the Secretary if the arrangement made turns out to be an improvident one so far as the Indians are concerned.

■ As we have said, the implied reservation of the waters of this stream extended to so much thereof as was required to provide for the reasonable needs of the Indians, not merely as those needs existed in 1908, but as they would be measured in 1915, when the Indian ditch system had been completed. If we assume that this 1915 need extended to substantially all of the waters of Ahtanum Creek, then the question is whether, conceding that the Secretary had the power to make an agreement for some workable division, can it be said that he had the power to agree to give to the white settlers 75 percent of that which the Indians might need in 1915 and subsequent years?

The record here makes it plain that the only person who gave the proposed agreement any study was Engineer Code. The agreement was drawn and signed, not only without consulting the Indians, but without legal advice. His reference to the "recent Montana decisions" (see footnote 11, supra) shows that he knew of the Winters case. Whether he knew that the Supreme Court had affirmed the case on January 6 preceding execution of the agreement,

does not appear. It seems likely that the force and broad reach of that decision was not realized by Mr. Code or any one else in the Interior Department at that date. See footnote 11a, supra.

With an opportunity to study the history of the Winters rule, as it has stood now for nearly 50 years, we can readily perceive that the Secretary of the Interior, in acting as he did, improvidently bargained away extremely valuable rights belonging to the Indians. Perhaps the feature of the whole matter most worthy of criticism is the apparent failure of the Secretary, before approving such an arrangement, to obtain legal advice either from the Solicitor or from the Department of Justice, as to the validity or the advisability of the proposed agreement. Viewing this contract as an improvident disposal of three-fourths of that which justly belonged to the Indians, it cannot be said to be out of character with the sort of thing which Congress and the Department of the Interior has been doing throughout the sad history of the Government's dealings with the Indians and the Indian tribes. That history largely supports the statement: "From the very beginnings of this nation, the chief issue around which federal Indian policy has revolved has been, not how to assimilate the Indian nations whose lands we usurped, but how best to transfer Indian lands and resources to non-Indians." [23]

---

23. Quotation is from an article on "The Raid on the Reservations" by Dorothy Van de Mark, Harper's Magazine, March, 1956 (Vol. 212, No. 1270). The author sketches the history of our dealings with the Indians, illustrating with references to such examples as the Indian Removal Act, 4 Stat. 411, the successive removals of the Cherokees from lands coveted by the white man, and what happened to the reservations under the General Allotment Act of 1887. Another illustration of this same pattern of giving the Indian the short end of the stick is found in the way in which Indian timber is sold for less than market prices, recently commented upon in Squire v. Capoeman, 351 U.S. 1, 4, 76 S.Ct. 611, footnote 7.

Because it has long been the law that there are few rights granted by treaty to Indians which Congress is obliged to respect, Lone Wolf v. Hitchcock, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299, the general Allotment Act of February 8, 1887, 25 U.S.C.A. § 331, was not open to challenge in the courts, and hence the Indians were obliged to accept allotments so small that livestock farming was impractical and the Indians often reduced to leasing the allotments to non-Indians. The so-called surplus unallotted lands were thrown open to white settlers and sold at nominal prices. See for example, 33 Stat. 302, relating to the Flathead Reservation. When a particular allotment happened to be valuable, the Secre-

The numerous sanctimonious expressions to be found in the acts of Congress, the statements of public officials,[24] and the opinions of courts respecting "the generous and protective spirit which the United States properly feels toward its Indian wards", Oklahoma Tax Comm. v. United States, 319 U.S. 598, 607, 63 S.Ct. 1284, 1288, 87 L.Ed. 1612, and the " 'high standards for fair dealing' required of the United States in controlling Indian affairs", United States v. Alcea Band of Tillamooks, 329 U.S. 40, 47, 67 S.Ct. 167, 170, 91 L.Ed. 29, are but demonstrations of a gross national hypocrisy.

■ But we are constrained to hold that since some arrangement for the apportionment of the Ahtanum waters was the sort of thing which the Secretary was authorized to do by the grant of general powers of supervision and management, he therefore had the power to make the 1908 agreement. The Secretary's mistakes, his poor judgment, his overlooking or ignoring of the true measure of the Indians' rights, his lack of bargaining skill or determination may add up to an abuse of his power, but do not negative it, or make his act ultra vires.

The most serious argument against our construction of the statute as granting the Secretary of the Interior the right to make this contract which took away three-fourths of the Indians' water rights, is to be found in the necessary consequences of our holding. In Shoshone Tribe v. United States, 299 U.S. 476, 57 S.Ct. 244, 81 L.Ed. 360, the Commissioner of Indian Affairs in 1878 agreed to permit and permitted intruding members of the Arapahoe tribe to move upon a portion of the Shoshone Indian reservation which by treaty had been reserved for the Shoshone tribe. Thereafter the Commissioner continued to rule and act on the assumption that the occupancy of the Arapahoes, who had been brought in with a show of military force on the part of the Government, was permanent and rightful. Subsequent recognition of the occupancy of the Arapahoes was ratified by act of Congress. It was held that this chain of events amounted to a taking or an appropriation of the rights of the Shoshone tribe as of the 1878 action of the Commissioner. The court said, 299 U.S. at page 497, 57 S.Ct. at page 251: "Power to control and manage the property and affairs of Indians in good faith for their betterment and welfare may be exerted in many ways and at times even in derogation of the provisions of a treaty. Lone Wolf v. Hitchcock, 187 U.S. 553, 564, 565, 566, 23 S.Ct. 216, 47 L.Ed. 299. The power does not extend so far as to

tary refused to convey it. Arenas v. United States, supra. The allotments originally required to be held in trust were in a multitude of cases caused to be patented in fee to the Indians who proceeded to sell or mortgage them and thus lose them to the white owners, a process which goes forward to this day. For instance see Laws of 84th Cong., 2nd Sess., Chapter 107, Public Law 450, approved March 29, 1956; Public Law 539 of the same Congress, Chapter 326, approved May 28, 1956. Sometimes the courts have been able to block some of the more flagrant consequences of this practice. See Glacier County, Mont. v. United States, 9 Cir., 99 F.2d 733; Ward v. Board of County Com'rs of Love County, 253 U.S. 17, 40 S.Ct. 419, 64 L.Ed. 751.

24. Governor Stevens to the Yakimas, May 30, 1855: "The Great Father has learned much of you. * * * I went back to the Great Father last year to say that you had been good, you had been kind, he must do something for you. * * * The Great Father said I want them to have more and larger farms; I told him you had cattle and horses; he answered that he wanted your horses and cattle to increase; * * *. Why did the Great Father answer in this way? Why did he send my brother and myself here this day, to say this to you? Because you are his children; his red children are as dear to him as his white children. * * * "

Section 3, Indian Removal Act, supra: " * * * it shall and may be lawful for the President solemnly to assure the tribe * * * that the United States will forever secure and guaranty to them * * * the country so exchanged with them * * *."

enable the government 'to give the tribal lands to others, or to appropriate them to its own purposes, without rendering, or assuming an obligation to render, just compensation; * * * for that "would not be an exercise of guardianship, but an act of confiscation." ' " Here, as we have noted, Congress has never ratified the act of the Secretary in giving the Ahtanum waters to the white settlers. Of course, our holding that the Secretary acted within his powers means that we are giving to his conduct in this regard the same characteristics as an act of appropriation as that which was found to have been accomplished in Shoshone Tribe v. United States, supra.[25]

It is clear that the action of the district court in dismissing the appellant's suit was error. The suit, like other proceedings designed to procure an adjudication of water rights, was in its purpose and effect one to quiet title to realty. Rickey Land & Cattle Co. v. Miller & Lux, 9 Cir., 152 F. 11, 15, affirmed 218 U.S. 258, 31 S.Ct. 11, 54 L.Ed. 1032. It presented claims and issues which required the court to determine and adjudicate the extent of the rights of the parties with respect to the waters of the stream; a determination of the validity of the 1908 agreement did not call for the trial court's conclusion that the United States had no interest whatever in the Ahtanum waters.

Furthermore, as in the case of other suits to quiet title, the defendants should have been required to appear by answer and set forth their claims of right to the use of the waters of the stream. Reynolds v. Schmidt, 10 Cir., 40 F.2d 238, 240. In general, they did not do so.[26] Thus the answer of Ahtanum Irrigation District and of "the above named defendant landowners, water users, lienholders and encumbrancers whose lands lie within the boundary of said district", is wholly uninformative as to who these water users are, what lands they claim to have the right to irrigate, or how they deraign their titles to any water rights. In addition to admitting and denying certain allegations of the complaint, this answer contains only (1), a plea of laches on the part of the Indians; (2), a plea of the statute of limitations as against the owners of Indian lands patented in fee simple; (3), allegations as to the execution and validity of the 1908 agreement; (4), the allegation that the waters in the creek are insufficient to irrigate both sides thereof; and (5), the allegation that the reservation lands could obtain water supplies from other sources in the Indian reservation without excessive cost. The sufficiency of these answers was challenged by the United States in the pretrial statement. Since the cause must be remanded for further proceedings in the trial court, and since those proceedings must determine and adjudicate the respective rights of the parties, during which defendants must be required to show and disclose their rights and titles, it is apparent that proper and appropriate answers must be required from all defendants. Although a pretrial order was made, it wholly failed to correct or deal with this insufficiency of the answers.

The opinion of the trial court found fault with the Government's proof of its water rights, saying [124 F.Supp. 838]: "Since the government cannot recover upon a claim of right of the Yakima Indian nation as an entity, but only as the trustee for several individual Indians who hold trust patents respectively, the claim of each respective owner must be specifically set up and proved, and further there must be proof of acts of some defendant or defendants which interfere with the trust owners of par-

---

25. This suit was filed July 2, 1947. The record shows that on July 24, 1951, a few days before the expiration of the time limited in § 12 of the Act of Aug. 13, 1946, 25 U.S.C.A. § 70k, the Yakima Tribe filed a claim based on the 1908 agreement, with the Indian Claims Commission.

26. An exception was the answer of the Corporation of the Catholic Bishop.

ticular pieces of property, before the government can require any landowner north of the boundary to plead or prove his claim to ownership of a water right." With this we disagree. By maps and Indian Office records the United States showed the location, point of diversion and capacity of each ditch constructed by Indians, or by the Indian Service, and the description, irrigable area, and location of all reservation lands served by those ditches with water from Ahtanum Creek. Also shown are the rate of progress through the years since the creation of the treaty in getting this water upon these lands. Just which lands are Indian owned, whether under trust or fee patent, and which are owned by successors of Indian allottees, also was proven. The quantities of water required by these lands was both stipulated and proven. No more was required, for the United States has the right to make distribution of its water under such rules as it may adopt, as provided by 25 U.S.C.A. § 381 (note 16, supra). It is no concern of ours which particular parcels or allotments are served by the Indian Service ditches, so long as adequate proof was made of their aggregate needs.

It is important that we bear in mind just how the defendants here must deraign their water rights. The record indicates, as we have noted, that the bulk of the waters flowing in Ahtanum Creek would be required for the irrigation of the lands on the reservation which were susceptible of service through the Indian irrigation system completed in 1915 The right to the use of that quantity of water was for the reasons previously indicated originally the exclusive property of the United States as trustee for the Indian tribe. No portion of that volume of water or of the right to the use thereof, was open to appropriation or other acquisition under state law by the defendants or their predecessors in interest. United States v. McIntire, 9 Cir., 101 F.2d 650, 653–654; cf. Federal Power Comm. v. State of Oregon, 349 U. S. 435, 75 S.Ct. 832, 99 L.Ed. 1215. To

the extent that the defendants are to be permitted to have any part of the use of that portion of the flow of the stream, their rights are deraigned from the agreement of 1908. Apart from that agreement, those defendants would have no right to the use of any of said waters except in strict subordination of the prior and better rights of the United States as trustee for the Indians. Of course, as between themselves, they could acquire priorities under state law in respect to their use of the surplus after the interest of the Indians had been satisfied but in relation to that surplus only.

Again the 1908 agreement was not made between Engineer Code on the one hand and all citizens of the state of Washington on the other. The agreement was made with specified individuals, and since it related to the use of water, certain qualifications must necessarily be treated as implied conditions thereof. It seems plain that if this, as other agreements relating to Indian rights, is to be construed most strongly in favor of the Indians, it must be understood that the right to the use of the 75 percent of the waters must have been limited to the needs as of 1908 of the particular individuals who were parties to the agreement.

In the case of Benton v. Johncox, 17 Wash. 277, 49 P. 495, 39 L.R.A. 107, the Supreme Court of Washington, in a suit between non-Indian users of water of this same Ahtanum Creek, held that the riparian owners of land upon the stream were entitled to an injunction restraining the non-riparian owners from diverting or interfering with the water of the stream; this on the theory that the common law as expounded in Lux v. Haggin, 69 Cal. 255, 4 P. 919, 10 P. 674, 753, was the law of Washington at the time when the ownership of these riparian owners was first initiated. But whether the beneficiaries of the 1908 agreement were dealing as riparian proprietors, or were confined to such owners, or whether owners of appropriative rights were included, their interests as of 1908 were neces-

sarily limited to their then needs, and subsequent uses or ownerships could not enlarge their rights under the arrangement for the division of these waters.

We hold that at any time when the needs of those parties to that agreement, as measured in 1908, were such as to require less than the full 75 percent of the waters of the stream, then their rights to the use of the water was correspondingly reduced, and those of the Indians, in like measure, greater. This follows from the proposition that it is a fundamental maxim of the law of waters that an individual's rights, no matter how measured or described, can never exceed his needs. Vineyard Land & Stock Co. v. Twin Falls, etc. Co., 9 Cir., 245 F. 9, 22. It follows also from the general principle that an agreement of the character of that executed in 1908, must be construed as reserving to the Indians, who previously owned substantially all of the waters, everything not clearly shown to have been granted.[27] What we have here referred to are necessarily issues which must be determined by further proceedings in the trial court, and the parties should be required by pleading or pre-trial agreements to frame such issues for trial.

Another issue raised by the United States in the pre-trial order was that the defendants in the use of their claimed 75 percent of the waters, were wasteful. Evidence to this effect was offered and received at the trial. It tended to show irrigation water diverted by the defendants permitted to run to waste upon highways, diverted through open channels with no headgates or measuring devices, old river beds and sloughs used in place of ditches, and the like. The court never reached that issue of course for it dismissed the complaint in its entirety. Waste of irrigation water is not to be tolerated and in arriving at a determination of the rights and needs of the defendants, the court must take into consideration the question of wasteful practices alleged to have been carried on by the defendants. In a case of this character an injunction against such waste is an appropriate part of the decree if the facts developed disclose a need for it. Campbell v. Grimes, 62 Kan. 503, 64 P. 62. If waste cannot otherwise be prevented, a court may restrain a party from using any water until his waste is averted. Glaze v. Frost, 44 Or. 29, 74 P. 336.

Another issue raised by the United States in the pretrial order is that the defendants have sunk numerous wells by which an additional draft has been made upon the available physical supply of water within the watershed. This is claimed to be to the detriment of the United States.

In the process of making a complete adjudication of the rights of the parties it is appropriate for the court to inquire into the question of compliance by the defendants not only with the implied but with the express requirements of the agreement of May 9, 1908. That agreement contained provisions that the users of water of Ahtanum Creek must divert the same by substantial headgates equipped with suitable control appliances and with measuring devices. It would appear to be elementary that the court must condition diversion of Ahtanum Creek waters claimed under the 1908 agreement upon compliance with both the express and the implied conditions of that agreement.

27. The record indicates that there has from the beginning been a dispute as to whether the agreement applied prior to the season of low water, or in times of early high water. The records of flow in the Indian Irrigation Service main canal for the years 1911 through 1929 appear on page 49 of the Hearings mentioned in note 14, supra. They show a full head at the beginning of each season, that in some years the head was never cut to 25 percent, in a few it was so cut for only a few days, while in most years it was cut to 50 percent in mid-season. The claims of the parties in respect to this dispute are for adjudication by the trial court in the light of its determination of the needs of the parties and the other circumstances of the case.

It is thus noted that the record here lacks both the statements of claim, and the evidence necessary for determination of issues required to be decided for a complete adjudication of the rights of the parties in this stream. For that reason we have no basis for a ruling upon appellee's motion for an injunction, and that application is denied.

The Government has not taken a definite stand in its argument here with respect to the rights of the so-called "Class Three Defendants", namely, the successors in interest of the original allottees to whom patents in fee were issued, describing lands under the Indian Irrigation ditch. The trial court in its finding No. 18 found that these patentees or their successors, had failed, for a period of more than ten years, to assert any rights to the 75 percent of the waters of the stream and had lost any rights thereto. These defendants claim that as successors to certain original Indian allottees for whom the waters were reserved and for the benefit of whose lands the Indian ditches were constructed, these defendants have acquired a vested interest in and a right to the distribution of the waters diverted by the United States to the same extent as if their lands were still in the possession of the original allottees. That they did originally acquire such a right through purchase of allotments seems clear from United States v. Powers, 305 U.S. 527, 59 S.Ct. 344, 83 L.Ed. 330. That case holds that white transferees of such fee patented Indian allotments were equally with individual allottees beneficially entitled to distribution of the waters diverted for the Indian irrigation system.

The question remains whether those of them who had acquired such interest more than ten years prior to the institution of this suit are barred by statute of limitation or laches from now claiming any such participation in the benefits of the Government's irrigation system. We think that the answer is to be found in the fact that in any suit brought by any one or more of these Class Three defendants, against the other defendants here, the trustee holder of the water rights would be a necessary party. Cherry v. Howell, 2 Cir., 66 F. 2d 713. And since the trustee, the United States, was not susceptible to suit, and could not be made a party defendant, the rights of those third party defendants cannot be said to be barred and that they are entitled to participate rateably with the Indian beneficiaries in the use of such waters as may be decreed to the United States in this suit.

The judgment is reversed and the cause is remanded for further proceedings in the court below not inconsistent with this opinion.

CHAMBERS, Circuit Judge (concurring).

I concur. I do think that there may be unintended overtones in what Judge POPE says about the Interior Department, Assistant Secretary of the Interior Pierce and Chief Engineer Code which are a little harsh as to their conduct in 1908. I assume that the two men have departed from this vale and 48 years later they cannot defend themselves. Even though they may have known of the Winters decision, those who have a duty to act today may make mistakes which, in the course of future events, may indicate bad judgment.

If the 1908 agreement today works a great injustice, I think that it is for the Congress to correct the unfairness if such there be by developing other irrigable land for the Indians involved. Therefore, I think it is right that we should uphold the agreement of 1908.